Filed 5/16/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H044238 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS150802) |
| v. | |
| MANUEL JESUS JIMENEZ, | |
| Defendant and Appellant. | |

A jury found defendant Manuel Jesus Jimenez guilty on 15 counts of sexually molesting three victims over a two-year period. The jury also found true allegations that he had committed the offenses against multiple victims. The trial court imposed an indeterminate term of 175 years to life in prison and a determinate term of four years four months.

Jimenez raises numerous claims on appeal. First, he contends the prosecution committed misconduct in closing argument by stating he was no longer presumed innocent and shifting the burden of proof to the defense. Second, he contends the trial court erred by admitting a note that one of the victims had written to her mother disclosing the sexual abuse. Jimenez also raises claims of ineffective assistance of counsel and cumulative prejudice in connection with these claims. He further contends the evidence was insufficient to support convictions on two counts of forcible lewd acts because the evidence failed to prove he used force or duress. We conclude these claims are without merit.

Finally, Jimenez alleges the trial court erred by imposing terms of 25 years to life based on sentencing enhancements the prosecution failed to plead. He also claims his

sentence constituted cruel and unusual punishment.  We conclude the trial court erred by sentencing Jimenez based on enhancements that were never pleaded.  Accordingly, we will reverse the judgment and remand solely for resentencing.  We do not reach the claim of cruel and unusual punishment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The prosecution alleged Jimenez committed multiple offenses against each of three victims:  K.D., S.D., and A.D.

### A.  *Procedural Background*

The prosecution charged Jimenez with 19 counts:  Count 1—forcible lewd act on a child under 14 (digital penetration of K.D. while she was awake, the first time) (Pen. Code, § 288, subd. (b)(1)); count 2—forcible lewd act on a child under 14 (digital penetration of K.D. while she was awake, the last time) (Pen. Code, § 288, subd. (b)(1)); count 3—lewd act on a child aged 14 or 15 by a defendant at least 10 years older (touching K.D. in the car after buying her an iPod) (Pen. Code, § 288, subd. (c)); count 4—lewd act on a child under 14 (touching K.D.'s vagina while she was asleep, the first time) (Pen. Code, § 288, subd. (a)); count 5—lewd act on a child under 14 (touching K.D.'s vagina while she was asleep, the last time) (Pen. Code, § 288, subd. (a)); count 6—lewd act on a child aged 14 or 15 by a defendant at least 10 years older (putting his hand down K.D.'s pants as witnessed by S.D.) (Pen. Code, § 288, subd. (c)); count 7—sexual penetration of a child 10 or under (digital penetration of S.D., the first time) (Pen. Code, § 288.7, subd. (b)); count 8—sexual penetration of a child 10 or under (digital penetration of S.D., the last time) (Pen. Code, § 288.7, subd. (b)); count 9—forcible lewd act on a child under 14 (touching S.D.'s vaginal area, the first time) (Pen. Code, § 288, subd. (b)(1)); count 10—forcible lewd act on a child under 14 (touching S.D.'s vaginal area, the first time) (Pen. Code, § 288, subd. (b)(1)); count 11—lewd act on a child under 14 (touching S.D.'s vaginal area, the first time) (Pen. Code, § 288, subd. (a)); count 12—lewd act on a child under 14 (touching S.D.'s vaginal area, the last time)

2

(Pen. Code, § 288, subd. (a)); count 13—lewd act on a child under 14 (touching S.D.'s chest) (Pen. Code, § 288, subd. (a)); count 14—lewd act on a child under 14 (touching A.D., the first time, when she was 13) (Pen. Code, § 288, subd. (a)); count 15—lewd act on a child under 14 (touching A.D., the last time, when she was 13) (Pen. Code, § 288, subd. (a)); count 16—lewd act on a child aged 14 or 15 by a defendant at least 10 years older (putting his hand under A.D.'s shirt to touch her breasts) (Pen. Code, § 288, subd. (c)); count 17—lewd act on a child aged 14 or 15 by a defendant at least 10 years older (incident involving A.D. in the Denny's parking lot on Aunt's birthday) (Pen. Code, § 288, subd. (c)); count 18—sexual battery by restraint (incident involving A.D. in the Denny's parking lot on Aunt's birthday) (Pen. Code, § 243.4, subd. (a)); and count 19— lewd act on a child aged 14 or 15 by a defendant at least 10 years older (grabbing A.D.'s breasts and buttocks at the house in Marina on Aunt's birthday) (Pen. Code, § 288, subd. (c)). As to counts 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14 and 15, the prosecution alleged Jimenez committed the offenses against more than one victim. (Pen. Code, § 667.61, subds. (b) & (e).)

The case went to trial in November 2016. At the close of evidence, the trial court granted the prosecution's motion to dismiss counts 9, 10, 18, and 19. The jury found Jimenez guilty on all remaining counts and found true the multiple-victim enhancements.

The trial court imposed a determinate term of four years four months and an indeterminate term of 175 years to life in state prison. The determinate term consisted of three years on count 3, consecutive eight-month terms for counts 16 and 17, and a concurrent three-year term for count 6. The indeterminate term consisted of seven consecutive terms of 25 years to life on counts 1, 2, 4, 5, 11, 12, and 14, with concurrent terms of 25 years to life on counts 13 and 15. On counts 7 and 8, the court imposed terms of 15 years to life in state prison but stayed the terms under Penal Code section 654.

3

### B. Facts of the Offenses

#### 1. Overview

Jimenez began living with his girlfriend Kristine Doe in Salinas in January 2012, and they moved to Marina in October 2014. Kristine had two children by another father—her daughter K.D., born in December 1999, and her son B.D., born in November 2004. In September 2012, Kristine gave birth to another daughter, fathered by Jimenez.

Kristine had two sisters—Angela Doe and Jennifer Doe. Angela's daughter S.D. was born in August 2005, and Jennifer's daughter A.D. was born in October 1999. S.D. and A.D. frequently visited their cousin K.D. while she was living with Jimenez.

The prosecution alleged Jimenez molested K.D., S.D., and A.D. on multiple occasions between January 2013 and May 2015.

#### 2. Testimony of K.D.

K.D. was 16 when she testified at trial. She testified that she met Jimenez in 2012 when he started dating Kristine. Jimenez lived with them in an apartment in Salinas. In 2014, they all moved to a trailer in Marina. The family members often slept in the same room.

At first, K.D. had a good relationship with Jimenez. He was like a father to her, and she called him "dad." But the relationship changed when he started molesting her. It started happening around the time K.D. was in seventh grade. He started kissing her on the lips instead of the cheek. She told him not to kiss her like that, but he threatened to leave her mother, and he would start fights with Kristine for no reason. This concerned K.D. because Jimenez was helping them financially.

Jimenez then started touching K.D. inappropriately. This started when they were living in Salinas, while K.D. was still in seventh grade. Jimenez tried to put his hands down her pants while she was sleeping. He touched her vagina under her clothes and woke her up. She stopped him and pushed his hands away, but he tried to touch her again. He made contact with her bare skin, and he put his fingers inside her. It happened

4

on more than one occasion. K.D. could not recall how many times it happened, but she testified that it happened a lot. K.D. thought about telling Kristine but decided against it because Jimenez was helping her mother. On one occasion, K.D. was lying down listening to music in her mother's room in Salinas when Jimenez "started putting his hand down there." K.D. would try to move his hand away, but he kept trying. He was touching her vagina through her clothes.

These incidents continued to happen after K.D. turned 14 and they moved to Marina. Jimenez tried to touch her breasts, and he would grab her hand and try to put it down his pants. She would pull away when he did that, and then he would try to touch her vagina. Sometimes she would call out to her brother B.D., but Jimenez would stop before B.D. entered the room. This happened around two or three times.

When Kristine was in the hospital after giving birth, Jimenez touched K.D. more frequently. Jimenez started treating K.D. differently—for example, trying to be alone with her and wanting to take her somewhere. Jimenez would give her presents or buy her something expensive, like an iPod or a bike. After driving to Best Buy to buy her an iPod, he drove them into a field, stopped the car, and tried to have sex with her. She was sitting in the front passenger's side seat when he tried to get on top of her. He was touching her breasts and trying to unbutton her pants. She pushed him away and told him to stop, and in response he told her to get out of the car. When she threatened to tell her mother, he drove her home.

K.D.'s cousin A.D. is close in age to K.D. A.D. would sometimes visit K.D. and spend the night at the apartment in Salinas. She also spent the night at the trailer in Marina once or twice. Jimenez would wrestle with A.D. while play-fighting with all the kids. A.D. told K.D. that Jimenez made her uncomfortable because he was trying to touch her. K.D. told Kristine about this. S.D. told K.D. it was happening too.

K.D. wrote her mother a note and put it in her mother's purse before leaving for school. The prosecution introduced the note into evidence. It stated, "Mom, I didn't

5

know how to tell you this but Jesus has been touching me for awile [*sic*] now and I only cut in Salinas because I felt like I should be punnished [*sic*] for it[.]  I'm sorry mom[.]  [I]t's all my fault[.]  I guess I'm not the daughter you prayed for[.]  [W]hen I get out of school I won't be coming home[.]  I'm going to target and then I'm leaving idk where, I'm sorry[.]"  K.D. called her mother later in the day and told her about the note.  Kristine and S.D.'s mother then took K.D. to the police station.

### 3. *Testimony of S.D.*

S.D. was 11 years old when she testified at trial.  She knew Jimenez because he was dating her aunt Kristine.  S.D. would visit them at the trailer in Marina early in the morning before going to school.  Everyone would sleep in the same room.

Jimenez would touch S.D. in her "private" parts.  At trial, S.D. was given a piece of paper with the outline of a girl's body, and she circled the areas where he touched her.  She circled the chest area, and the "front private area" on the bottom.  He touched her there more than once, inside her clothes with his fingers.  He would unbuckle her pants and pull up her shirt to touch her chest.

S.D. testified that Jimenez "moved his fingers on my private."  Sometimes one of his fingers would go inside her and then out again.  She felt pain on one occasion, like he had scratched her.  His finger went inside her more than once.  Sometimes she would tell him to stop, and he would say "shh."  She would also grab his hands to pull them off of her, but sometimes he would not stop.

Sometimes Jimenez would try to make S.D. touch him.  He would grab her wrist and put her hand on his private part while his pants were down.  She would pull her hand away but he would try to do it again.  She would tell him to stop, but he told her to be quiet.

S.D. disclosed the abuse for the first time after she saw Jimenez touching K.D.  S.D. told K.D. because S.D. wanted to make K.D. tell the truth.  This was shortly before

6

they both talked to the police.  S.D. saw Jimenez put his hand under K.D.'s clothing on her "front private part."  It happened at night while they were sleeping in bed together.

### 4. *Testimony of A.D.*

A.D. was 17 years old when she testified at trial.  She met Jimenez in the summer between eighth grade and ninth grade.  She would spend the night at K.D.'s house every other weekend.  Jimenez would start wrestling with them, during which he would grope A.D. without her permission.  He touched and squeezed her breasts and smacked her butt to the point where it made her uncomfortable.  He grabbed her breasts on more than one occasion, before and after A.D. turned 14.  He also grabbed her by the arm, pulled her close to him, turned her over and tried to smack her butt.  She tried to fight back, but he held her from behind and laughed when she told him to stop.  A.D. told K.D. about it and asked K.D. to tell her mother.  K.D. said she told her mother, but Kristine just told them to stay away from Jimenez because he doesn't know what he's doing.

When A.D. slept at K.D.'s house, she would wake up in the morning with Jimenez's face inches in front of A.D.'s face, and he would put money under her pillow.  A.D. also recalled an incident on her aunt's birthday at a Denny's in February 2015.  Jimenez started pushing and wrestling with A.D. between two parked cars.  He put his hands around her, and she tried to move away but he would not let her go.  Later, when they got home, Jimenez jumped on top of her on the couch and tried to wrestle with her again.

On another occasion, A.D. was wearing a loose-fitting shirt when Jimenez approached her from behind and tried to slide his hand up the front of her shirt.  But A.D. was able to move out of the way, so he only touched her stomach.  Afterwards, Jimenez wrestled with A.D. and K.D. while grabbing at them and "trying to get us both to mess around."  Whenever the three of them were wrestling, Kristine would yell at the girls and tell them to stop messing around with him.

7

### 5. *Pretext Phone Calls*

K.D. made several pretext phone calls to Jimenez with the assistance of police. When K.D. said she thought S.D. had seen "what happened the other day," Jimenez responded that "nothing happened" and told K.D. to "tell her that it's not, it's not true."[1] In a subsequent call, K.D. later said S.D. wanted to tell Kristine, and Jimenez responded, "Well, tell her that she's a liar," and "Well tell her, 'Maybe you're dreaming.' " Jimenez ended each call after a brief time.

### 6. *Testimony of Jimenez*

Jimenez testified in his defense. He specifically denied he had inappropriately touched S.D., K.D., or A.D. as alleged. When asked if he had ever wrestled with A.D., Jimenez responded, "Well, no, not wrestling specifically. More like they used to like to bother me, and I would tell them to calm down." He said, "I would gesture as if I was going to slap them in the butt, but I never actually did," and he added, "You know, when [K.D. and A.D.] get together, they start just causing trouble." With respect to the pretext phone calls, he testified that he told K.D. to tell S.D. she was lying because the calls were interrupting his work and he wanted to end them quickly.

## II. DISCUSSION

### A. *The Prosecution's Closing Argument*

Jimenez contends the prosecution committed misconduct during closing argument by misstating the burden of proof and shifting the burden to the defense to show the victims were lying. Because Jimenez's trial counsel failed to object, Jimenez contends his attorney rendered ineffective assistance of counsel. The Attorney General contends the prosecutor did not commit misconduct, and that even assuming the argument was improper, Jimenez suffered no prejudice.

---

[1] The calls were conducted in Spanish. The quotes are taken from the English translation.

### 1. Procedural Background

In closing argument, the prosecution addressed the standard of proof as follows: "And beyond a reasonable doubt. You heard that instruction previously. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. [¶] And you may think what does that mean? You know, abiding conviction of the truth of the charge. That's probably not everyday language that you encounter in your lives. And you got another—there's another instruction that will tell you unless a word is specifically defined, you have to use it's [*sic*] everyday meaning in interpreting that word, in defining that word. And you're not going to get a special legal definition of abiding conviction. [¶] And really—so what it comes down to is, are you convinced? And you don't need to be convinced beyond a reasonable doubt as to every detail of what happened. What you need to be convinced of beyond a reasonable doubt are the elements of the crimes charged. And there are specific things that the Judge, in reading the instructions, will tell you need to be proven for each count. [¶] But you absolutely do need to be convinced. And what it takes for one person to be convinced is ultimately going to be a personal decision to you. And it may not be the same fact or the same witness or the same exhibit for one juror as another, and that's fine. It doesn't have to be. It's your individual decision as to how you do feel convinced."

At the end of closing argument, the prosecution stated, "Now, at this point you heard all the evidence. You still have to hear the argument from [defense counsel] and final argument from me, but you've heard all the evidence. You've seen all three girls. You have had a chance to observe them, to listen to what they had to say. You've heard from the defendant. You heard those calls. You know now we're at the point where, you know, he's no longer presumed innocent, the line has been moved, and he's now been

9

proven guilty. And I ask you to return verdicts finding him guilty of all counts, and to find that he did commit these offenses against multiple victims."

In rebuttal, the prosecution again addressed the standard of proof: "Now, beyond a reasonable doubt. This is not an insurmountable hurdle. This is the standard of proof that's used every day in every criminal courthouse across the country. We're just asking you to be convinced. That's all. Are you convinced of what happened?"

Defense counsel did not object to any of these statements.

### 2. *Legal Principles*

" 'The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice.' [Citation.] 'To implement the presumption, courts must be alert to factors that may undermine the fairness of the factfinding process.' [Citation.] 'The presumption of the innocence of an accused attends him throughout the trial, and has relation to every fact that must be established in order to prove his guilt beyond reasonable doubt. [. . .] Moreover, 'the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1405-1406 (*Dowdell*).)

"When prosecutorial misconduct 'infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.' (*People v. Panah* (2005) 35 Cal.4th 395, 462 (*Panah*).) [. . .] ' " '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citation.] [¶] Generally, '[i]t is misconduct for the prosecutor to misstate the applicable law. . . .' [Citation.] However, 'To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' [Citation.] There are two exceptions to forfeiture: (1) the objection

10

or the request for an admonition would have been futile; or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. [Citation.] A defendant claiming one of these exceptions must find support for it in the record. [Citation.]" (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1406.)

" 'To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' [Citation.] ' "Finally, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.] 'It is the defendant's burden on appeal [. . .] to show that he or she was denied effective assistance of counsel and is entitled to relief. [Citations.] "[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." [Citation.]' " (*Dowdell*, *supra*, 227 Cal.App.4th at pp. 1406-1407.)

### 3. *Jimenez Suffered No Prejudicial Misconduct*

Jimenez contends the prosecution committed misconduct by stating he was "no longer presumed innocent" and telling the jury it need only be "convinced" of his guilt to convict him. He relies on *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159 (prosecution committed misconduct by stating the "presumption is gone" during closing argument) and *Dowdell*, *supra*, 227 Cal.App.4th at page 1408 (prosecution committed misconduct by stating defendant "ha[d] gotten his fair trial" in closing argument). The Attorney General argues that, when read in context, the prosecution's comments did not

11

constitute misconduct. The Attorney General relies on *People v. Booker* (2011) 51 Cal.4th 141 (not misconduct for prosecution to argue the defendant was presumed innocent until the contrary was shown) (*Booker*); *Panah*, *supra*, 35 Cal.4th 395 (not misconduct for prosecution to argue the evidence had "stripped away" defendant's presumption of innocence); and *People v. Goldberg* (1984) 161 Cal.App.3d 170 (*Goldberg*) (not misconduct for prosecution to argue that the case had been proven beyond a reasonable doubt by overwhelming evidence so that "there is no more presumption of innocence").

Taken together, these cases distinguish closing arguments that are acceptable—wherein the prosecution essentially contends the evidence has overcome the presumption of innocence—from statements that constitute misconduct, wherein the prosecution tells the jury it need no longer apply the presumption because it is no longer in effect as procedural matter. Here, the context of prosecution's argument places it in the former category. The statement "he's no longer presumed innocent" was preceded by several statements outlining the strength of the evidence, and the prosecutor immediately followed it up by stating, "the line had been moved, and he's now been proven guilty." In isolation, the statement "no longer presumed innocent" could be interpreted to mean the presumption was no longer in effect at the point of closing argument, but the context shows it was a statement about the strength of the evidence. We conclude the statement more closely resembled those in *Booker*, *Panah*, and *Goldberg*. Although we do not encourage the use of the statement made by the prosecutor here because of the risk of juror confusion, we conclude that the challenged statement does not constitute misconduct under these precedents.

Similarly, the prosecution's statements that the jury must be "convinced" Jimenez was guilty did not misstate the burden of proof. The prosecutor expressly prefaced these statements by properly stating that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true," adding, "What you need to

be *convinced of beyond a reasonable doubt* are the elements of the crimes charged." The context shows the prosecutor was using the term "convinced" to mean "convinced beyond a reasonable doubt," and it is not reasonably likely the jury misconstrued the statements to mean otherwise.

Even assuming the prosecutor's statements were improper, trial counsel failed to object. Jimenez does not argue that an objection or request for an admonition would have been futile, or that an admonition would have been insufficient to cure any harm. (See *Dowdell*, *supra*, 227 Cal.App.4th at p. 1406.) Rather, he contends his counsel rendered ineffective assistance. To show ineffective assistance of counsel, Jimenez bears the burden to show he was prejudiced. (*Id.* at pp. 1406-1407.) But it is not reasonably likely the outcome of the proceeding would have been different had counsel objected. The prosecution presented testimony from three victims, all of whom described similar conduct by Jimenez. Two of the witnesses—K.D. and A.D.—corroborated various details of each other's testimony, with A.D. testifying that she had personally witnessed Jimenez touching K.D. There was no evidence that any of the victims had any motive to fabricate or exaggerate their testimony. Furthermore, the trial court properly instructed the jury that the prosecution bore the burden of proof beyond a reasonable doubt, both before and after closing argument. In the absence of any showing to the contrary, we presume the jury adhered to the trial court's instructions. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211.)

We conclude Jimenez has not shown he was prejudiced by any assumed misconduct by the prosecutor or deficient performance by defense counsel. We would reach the same conclusion under the federal standard for prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [reversal required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict].) Accordingly, we conclude this claim is without merit.

13

## 4. *The Prosecution Did Not Improperly Shift the Burden of Proof*

Jimenez further contends the prosecution improperly shifted the burden of proof by arguing Jimenez had failed to show why the victims would have lied. The prosecution argued that "defense counsel and I both gave [Jimenez] several opportunities to give us a reason, any reason, why these girls would have so much animosity for him to make this up. [. . .] And, you know, I asked him any reason for these girls to make it up and all he could offer is, oh, well, children lie." Defense counsel did not object. The Attorney General contends Jimenez thereby forfeited his claim, and that in any event, the argument was not improper because it did not imply defendant had the burden of proof. Jimenez contends his trial counsel rendered ineffective assistance by failing to object.

Jimenez relies on *People v. Woods* (2006) 146 Cal.App.4th 106, 112 (a prosecutor may not suggest a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence) and *People v. Hill* (1998) 17 Cal.4th 800, 831 (prosecutorial misconduct by statement that "there must be *some evidence* from which there is a reason for a doubt"). Neither case supports Jimenez's position. The prosecution here did not argue that Jimenez had the burden to show the victims were lying. The prosecution was referencing statements Jimenez made in cross-examination that "kids lie a lot of times" and "kids a lot of times will agree on what they're going to lie about."[2] The prosecution's argument directly addressed this testimony. "The [prosecution's] argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] [. . .] The prosecutor is entitled to draw conclusions from the evidence presented and to state them to the jury. The right is very broad and includes the opportunity to fully state his [or her] views as to what the evidence shows and as to the

---

[2] Jimenez does not contend it was misconduct for the prosecutor to elicit this testimony in cross-examination.

14

conclusions to be drawn therefrom. [Citations.]" (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.)

Even assuming the prosecution's argument was improper, defense counsel did not object. Jimenez therefore has the burden to show counsel rendered deficient performance that caused him prejudice. (*Dowdell*, *supra*, 227 Cal.App.4th at pp. 1406-1407.) But it is not reasonably likely the result of the proceeding would have been different if counsel had objected. As set forth above, the prosecution presented testimony from three victims, all of whom described similar conduct by Jimenez, and two of whom corroborated each other in their accounts. There was no evidence the victims had a motive to testify untruthfully. Given the strength of the evidence, Jimenez has not met his burden to show a different result was reasonably probable. We conclude this claim is without merit.

Finally, Jimenez contends the cumulative effect of the asserted prosecutorial misconduct requires reversal. Because we do not find multiple instances of misconduct, there is no prejudice to cumulate.

### B. *Admission of K.D.'s Note to Her Mother*

As set forth above in section I.B.2, the trial court admitted a note K.D. wrote to her mother disclosing the fact that Jimenez had been touching her. He contends the trial court erred by admitting it because portions of it violated the fresh complaint rule and the note was unduly prejudicial under Evidence Code section 352. The Attorney General contends the trial court properly admitted the note.

#### 1. *Procedural Background*

The prosecution moved in limine to admit the note under the fresh complaint doctrine. Jimenez objected to the note as highly inflammatory and prejudicial under Evidence Code section 352. He also requested a limiting instruction.

The trial court found the evidence was not more prejudicial than probative. The court admitted the note for the nonhearsay purpose of establishing the circumstances

under which the victims reported the offenses, and the court granted the request for a limiting instruction.

The prosecution introduced the note through K.D.'s mother, Kristine. Kristine testified that she took K.D. to the police because K.D. had texted Kristine to inform her K.D. had placed a note in Kristine's purse. Kristine found the note, read it, and tried to contact K.D., but K.D. was not answering her phone. Kristine then called her sister Angela, whereupon Kristine, Angela, K.D., and S.D. all went to the police station.

Before Kristine read the note for the jury, the trial court issued a limiting instruction admitting the evidence "for the limited purpose as to what this witness did after receiving some communication, not for the truth of what was said in the communication." After Kristine read the note, the court again instructed the jury, "I'm going to remind our jurors that the contents of this statement that were just read are not to be considered by you for the truth of those statements, but for the limited purpose of establishing that [K.D.] made those statements at that time, and also to explain the subsequent actions of the witness after receiving those communications." When the prosecution later published the note to the jury, the court once again instructed the jury, "Again, the contents of that note, ladies and gentlemen, are not being admitted for the truth of what the note says, but rather only that [K.D.] said these things at this time under these circumstances to her mother, and also to show what her mother did after receiving the note."

K.D. also testified about the note. She explained that she had decided to disclose the touching to her mother because S.D. had told K.D. the day before that it was happening to S.D. too. K.D. then wrote the note and put it in her mother's purse. During K.D.'s testimony, the trial court instructed the jury, "I remind you, ladies and gentlemen, again, the truth of what S.D. told [K.D.] is not being offered or to be considered by you for the truth, but only [that] she said those things under those circumstances at that time,

16

and also for the limited purpose of showing why this witness may have acted subsequently to hearing those statements."

In closing argument, the prosecution read the note to the jury and argued, "Think about K.D. when she talked about that note, and how I asked her what was she apologizing for? And she said because it wouldn't have happened to S.D. if she had said something. That it was her fault. I don't think anyone here can deny that genuine, emotional reaction that she absolutely believes it's her fault what happened to S.D. You have no reason to disbelieve these three girls." Defense counsel did not object.

### 2. *Legal Principles*

"[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose— namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court has broad discretion in determining whether to admit or exclude evidence under Evidence Code section 352. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170.) Rulings under this section will not be overturned absent an abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) As a general matter, "an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.)

17

### 3. *Admission of the Note Was Not an Abuse of Discretion*

Jimenez concedes that the fact of K.D.'s disclosure to her mother was admissible under the fresh complaint doctrine, but he contends the note was highly emotional and inflammatory. He further argues that portions of the note—"the key details of the *length* and the *location* of the abuse, as well as the corroborating detail of cutting in Salinas"— were inadmissible under the fresh complaint doctrine. Jimenez further contends the admission of the note violated his due process rights by rendering the trial fundamentally unfair.

We are not persuaded. First, the "inflammatory" nature of the note was due largely to the fact that it disclosed the fact of the molestation, which was otherwise described in detail through the direct testimony of the victim. " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) " 'Prejudice' in the context of Evidence Code section 352 refers to the possibility of misuse of the evidence—use of the evidence by the trier of fact for a purpose for which the evidence is not properly admissible." (*People v. Hoze* (1987) 195 Cal.App.3d 949, 954.) Here, the jury was instructed to consider the note for the purpose of establishing the fact that K.D. and S.D. made the complaints, as well as to explain Kristine's subsequent actions. Jimenez makes no showing that the jury failed to adhere to this instruction.

Even assuming any portion of the note should not have been admitted, Jimenez cannot show how he was prejudiced by it. He contends the note was inflammatory because it disclosed "key details" of the length and location of the abuse—i.e., that it occurred in Salinas and had been happening "for awile [*sic*] now." But K.D.'s direct testimony set forth the location and duration of the abuse in much greater detail apart from the note; the note provided no new information in this regard. Similarly, although the note referenced K.D.'s act of cutting herself, her mother testified directly to

18

witnessing cuts on K.D.'s arms and legs, and Jimenez does not challenge the admissibility of that evidence.

Jimenez contends the prosecution violated his due process rights because the prosecutor used the note for the truth of its statements in closing argument. Jimenez is correct that the prosecution used the contents of the note to corroborate K.D.'s allegations. Defense counsel, however, lodged no objections to this argument.[3] Nor did counsel raise any due process objections to the evidence in pretrial motions. The Attorney General contends Jimenez has thereby forfeited this claim. We agree. But even considering the substance of the claim, admission of the note did not render the trial fundamentally unfair, and we would find the error harmless even under the federal standard for prejudice. (See *Chapman, supra,* 386 U.S. at p. 24 [reversal required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict].)

### C. Cumulative Prejudice

Jimenez contends the cumulative effect of the errors claimed above violated his due process rights. Because we find no errors, there is no prejudice to cumulate.

### D. Sufficiency of the Evidence for Counts 1 and 2

Jimenez contends the prosecution failed to present evidence sufficient to sustain convictions on count 1 (forcible lewd act against K.D. while she was awake—the first time) and count 2 (forcible lewd act against K.D. while she was awake—the last time). Specifically, he contends the evidence was insufficient to show he used physical force or duress in committing the offenses. The Attorney General contends the record shows Jimenez used force to overcome K.D.'s resistance.

---

[3] Jimenez does not claim ineffective assistance of counsel for the failure to object.

19

### 1. *Legal Principles*

On counts 1 and 2, the jury found Jimenez guilty of violating Penal Code section 288, subdivision (b), by digitally penetrating K.D.  That section prohibits lewd acts "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."  (Pen. Code, § 288, subd. (b).)  "Force, in this context, means physical force that is ' "substantially different from or substantially greater than that necessary to accomplish the lewd act itself." ' [Citation.]"  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004.)  " 'A defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act.' [Citation.]  'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial."  Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.' [Citation.]"  (*People v. Morales* (2018) 29 Cal.App.5th 471, 480.)

"In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question . . . is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Rowland* (1992) 4 Cal.4th 238, 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  The California Constitution requires the same standard.  (*Ibid.*)  This standard applies even when the prosecution relies primarily on circumstantial evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  "[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  A reviewing court must reverse a conviction where the

20

record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below. [Citation.] Nonetheless, it is the [trier of fact], not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt. [Citation.] And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. [Citation.]" (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)

### 2. *Substantial Evidence Supported Convictions on Counts 1 and 2*

Jimenez contends his convictions on counts 1 and 2 must be reversed because K.D. never testified that he used "physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself." (quoting *People v. Cicero* (1984) 157 Cal.App.3d 465, 473, disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229.) Relevant to this element, K.D. testified as follows:

"[Prosecutor:] And can you tell us a little bit kind of what would happen?

"[K.D.:] I would go upstairs to let him know that dinner was ready, or I would go up there to get something, and he would stop me.

"[Prosecutor:] And then what would happen when he would stop you?

"[K.D.:] He would try too [*sic*] touch me, and I would tell him to stop, and he wouldn't.

"[Prosecutor:] He wouldn't. Okay.

"[K.D.:] The only time he would stop is if someone was coming upstairs or calling for my name.

"[Prosecutor:] Did you tell him to stop? *Did you physically try to make him stop*?

"[K.D.:] *Yes.*

"[Prosecutor:] How would you do that?

21

"[K.D.:] *By pushing him away*.

"[Prosecutor:] And would that make him stop?

"[K.D.:] Yes. And then *he would try again and try again*.

"[Prosecutor:] Okay. Like right away he would try again?

"[K.D.:] Yeah." (Italics added.)

From this testimony, a reasonable juror could conclude beyond a reasonable doubt that Jimenez used force. K.D. testified that she tried pushing Jimenez away, and although that would make him stop, "he would try again and try again" right away. She stated that he would only stop if someone was coming upstairs or calling her name. The jury could infer from this that Jimenez used physical force to overcome K.D.'s attempts to push him away. (See *People v. Pitmon* (1985) 170 Cal.App.3d 38, 48 [sufficient evidence of force where defendant slightly pushed victim's hand back during the prohibited act], disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229; *People v. Babcock* (1993) 14 Cal.App.4th 383, 387 [jury could reasonably consider victim's resistance in assessing whether defendant used force to accomplish the lewd act].) This is sufficient evidence of force under Penal Code section 288. Accordingly, we conclude this claim is without merit.

## E. Imposition of Terms under Penal Code Section 667.61

Jimenez contends the trial court erred by sentencing him under Penal Code section 667.61, subdivision (j)(2) (hereafter section 667.61(j)(2)) because the information only cited subdivisions (b) and (e) of that section, and the jury found the allegations true under those specific subdivisions. Subdivisions (b) and (e) would mandate a sentence of 15 years to life on each of the relevant counts; the trial court sentenced Jimenez to 25 years to life for each of those counts under section 667.61(j)(2). He argues that the failure to plead section 667.61(j)(2) requires us to remand the matter for resentencing because the imposition of terms under that section violated his due process right to notice. The Attorney General contends Jimenez forfeited this claim by failing to object

but that no sentencing error occurred in any event.  We agree with Jimenez that his right to due process was violated when he was sentenced under the uncharged sentencing enhancement.

### 1. Background

As to counts 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14 and 15, the information alleged "within the meaning of Penal Code section 667.61(b) and (e)" that Jimenez committed an offense specified in section 667.61, subdivision (c) against more than one victim.  (Pen. Code, § 667.61, subds. (b) & (e).)  Subdivision (b) of that section mandates a term of 15 years to life for any offense enumerated in subdivision (c) when that offense is committed under one of the circumstances specified in subdivision (e).  The offenses enumerated in subdivision (c) include lewd or lascivious acts under as charged in the above counts.  (Pen. Code, § 667.61, subds. (c)(4) & (c)(8).)  Subdivision (e) includes the circumstance that the offense is committed against more than one victim.  (Pen. Code, § 667.61, subd. (e)(4).)  The jury found Jimenez guilty on counts 1, 2, 4, 5, 11, 13, 14 and 15, and found true the allegations that Jimenez did "commit the offense on more than one victim within the meaning of Penal Code Section 667.61 (b)/(e)", thereby mandating terms of 15 years to life on each count.

In its sentencing memorandum, the prosecution argued that the trial court could instead sentence Jimenez under section 667.61(j)(2) even though the information and verdict forms only cited subdivisions (b) and (e).  Section 667.61(j)(2) mandates a term of 25 years to life for a conviction of "an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), *upon a victim who is a child under 14 years of age . . . .*"  (Pen. Code, § 667.61. subd. (j)(2), italics added.)  But Jimenez was not charged under this section.

To support its argument, the prosecution relied on *People v. Mancebo* (2002) 27 Cal.4th 735, 753-754 (*Mancebo*).  The probation report also stated that Jimenez could be sentenced under section 667.61(j)(2).  Jimenez did not specifically object to or oppose

sentencing under that subdivision. The trial court sentenced him to terms of 25 years to life on counts 1, 2, 4, 5, 11, 12, 13, 14, and 15, apparently based on the enhancement under subdivision (j)(2).

### 2. Legal Principles

"The 'preeminent' due process principle is that one accused of a crime must be 'informed of the nature and cause of the accusation.' (U.S. Const., Amend. VI.) Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317.) The same principle applies to sentence enhancements. "[E]nhanced penalties [are] available only if the existence of any of those qualifying circumstances 'is alleged in the accusatory pleading pursuant to this section, and is either admitted by the defendant in open court or found to be true by the trier of fact.' [Citations.]" (*People v. Arias* (2010) 182 Cal.App.4th 1009, 1017-1018.)

### 3. Sentencing Under Penal Code Section 667.61(j)(2) Was Unauthorized

Before turning to the merits of the claim, we consider the Attorney General's argument that Jimenez forfeited it by failing to object below. Jimenez contends he did not forfeit the claim because the sentence was unauthorized. We agree with Jimenez. The waiver rule is inapplicable in these circumstances because an unauthorized sentence occurs when a court violates mandatory provisions governing the length of confinement. (*Mancebo*, *supra*, 27 Cal.4th at p. 749, fn. 7.)

As to the merits of the claim, the parties do not dispute that Jimenez was convicted of offenses enumerated in subdivision (c) of Penal Code section 667.61, nor that he was convicted of the offenses against multiple victims as specified in subdivision (e) of that section. Jimenez, however, contends that, based on the pleading, the applicable offenses were punishable only under subdivision (b) of that section, mandating terms of 15 years to life in prison, and not section 667.61(j)(2), which mandates terms of 25 years to life.

24

He argues that the prosecution's decision to plead enhancements under subdivision (b) rather than section 667.61(j)(2) failed to provide him notice of the substantially greater exposure he faced under the latter provision. Relying on *Mancebo*, he contends sentencing under the latter provision violated his due process rights.

In *Mancebo*, the information charged the defendant with several offenses arising from sexual assaults on two victims on separate occasions. (*Mancebo*, *supra*, 27 Cal.4th at p. 740.) The information also alleged the defendant was eligible for a life sentence under Penal Code section 667.61 based on three circumstances: kidnapping; firearm use; and binding of the victim. The information further alleged enhancements for personal gun use under Penal Code section 12022.5. The jury found the defendant guilty as charged and found all enhancements true. Reasoning that Penal Code section 667.61 precluded the gun use from being used under both Penal Code sections 667.61 and 12022.5, the trial court substituted the unpleaded circumstance under Penal Code section 667.61 that the offenses involved multiple victims, and on this basis the court imposed sentence based on both Penal Code sections 667.61 and 12022.5. The California Supreme Court held that this violated due process, explaining that "no factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing under section 667.61, subdivision (a). Thus, the pleading was inadequate because it failed to put defendant on notice that the People, for the first time at sentencing, would seek to use the multiple victim circumstance to secure indeterminate One Strike terms under section 667.61, subdivision (a) *and* use the circumstance of gun use to secure additional enhancements under section 12022.5(a)." (*Id.* at p. 745.) The high court explained, "We acknowledge that where a defendant is charged with and convicted of qualifying sex crimes against two or more victims, it may be difficult to meaningfully contest the truth of a multiple victim qualifying circumstance, whether or not that circumstance has been properly pled

so as to afford the defendant fair notice it is being invoked in support of One Strike sentencing.  But section 667.61 makes no special exception for the multiple victim qualifying circumstance—*the statute's pleading and proof requirements apply to all of the qualifying circumstances enumerated in subdivisions (d) and (e).*"  (*Id.* at p. 752, italics added.)  Jimenez contends the same principle applies to his case.

The Attorney General argues that *Mancebo* supports the sentence imposed here. He cites Penal Code section 667.61, subdivision (o), which provides that "[t]he penalties provided in this section shall apply *only if the existence of any circumstance specified in subdivision (d) or (e) is alleged in the accusatory pleading pursuant to this section*, and is either admitted by the defendant in open court or found to be true by the trier of fact." (Pen. Code, § 667.61, subd. (o), italics added.)  Because the pleading cited subdivision (e), the Attorney General argues that the pleading requirements set forth in subdivision (o) were satisfied.  But the language of that provision—"*only* if"—does not state that such pleading is *sufficient* for application of its enhanced penalties—only that it is *necessary*.  (See *California v. Hodari D.* (1991) 499 U.S. 621, 628 [the phrase "only if" states a necessary but not a sufficient condition].)

Here, the information only informed Jimenez he could be sentenced to terms of 15 years to life under Penal Code section 667.61, subdivisions (b) and (e) for committing the alleged offenses against multiple victims.  The information did not put him on notice that he could be sentenced to terms of 25 years to life under section 667.61(j)(2) for committing those offenses upon multiple victims, *at least one of whom was under 14 years of age*.[4]  Under these circumstances, imposition of sentence under section 667.61(j)(2) violated Jimenez's constitutional right to due process.  Indeed, the trial court itself overlooked the increased exposure under the latter provision.  In discussing a

---

[4] The language of the statute does not make clear whether all of the multiple victims must be under 14, or whether it is sufficient for only one to be under 14.  Because the information pleaded neither, we need not resolve this ambiguity.

26

pretrial disposition, the trial court informed Jimenez, "I wanted to clarify I think before when we talked, we talked about you facing something like 45 years to life, but the DA clarified and with your attorney present earlier today, you're actually looking at 150 years to life if convicted on all charges and enhancements."[5]  As the *Mancebo* court observed, "[I]n many instances a defendant's decision whether to plea bargain or go to trial will turn on the extent of his exposure to a lengthy prison term."  (*Mancebo*, *supra*, 27 Cal.4th at p. 752.)  Under the Attorney General's position, "there would be less incentive to plea bargain."  (*Ibid.*)

For the reasons above, we conclude the failure to plead the enhancement under section 667.61(j)(2) precluded sentencing based on that provision.  Accordingly, we will reverse the judgment and remand for resentencing.

### F.  Cruel and Unusual Punishment

Jimenez contends his sentence constituted cruel and usual punishment in violation of the California and federal constitutions.  Because we are remanding for resentencing, we do not consider this claim.

## III.  DISPOSITION

The judgment is reversed, and the matter is remanded for the sole purpose of resentencing.

---

[5] It appears the parties were assuming terms of 15 years to life based on the version of the information that had been filed at the time of that hearing, which had alleged only 10 counts of offenses enumerated in Penal Code section 667.61, subdivision (c).  If section 667.61(j)(2) had been pleaded, Jimenez would have been on notice that his total exposure was 250 years to life.

27

_____
Greenwood, P.J.

WE CONCUR:

_____
Grover, J.

_____
Danner, J.

People v. Jimenez
No. H044238

Trial Court:                                        Monterey County
                                                    Superior Court No.:  SS150802

Trial Judge:                                        The Honorable Carrie M. Panetta


Attorney for Defendant and Appellant               Alexis Ivar Haller
Manuel Jesus Jimenez:                              under appointment by the Court of
                                                   Appeal for Appellant




Attorneys for Plaintiff and Respondent             Xavier Becerra,
The People:                                         Attorney General of California

                                                   Gerald A. Engler,
                                                   Chief Assistant Attorney General

                                                   Jeffrey M. Laurence,
                                                   Senior Assistant Attorney General

                                                   Catherine A. Rivlin,
                                                   Supervising Deputy Attorney General

                                                   Ann P. Wathen,
                                                   Deputy Attorney General




People v. Jimenez
No. H044238