Filed 7/24/25  P. v. Samano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082941 |
| v. | (Super.Ct.No. RIF1802435) |
| JOSE ESPIRITO HUE SAMANO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge. Affirmed with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Jose Espirito Huertas Samano of eight counts of committing a lewd or lascivious act upon a child under 14 years old "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (Pen. Code, § 288, subd. (b)(1).)[1] The trial court sentenced defendant to prison for a term of 40 years.

Defendant raises three contentions on appeal. First, defendant asserts that, for three of his convictions, substantial evidence does not support the element of force, violence, duress, menace, or fear. (§ 288, subd. (b)(1).) Second, defendant contends the prosecutor committed misconduct during closing argument. Third, defendant asserts the trial court erred in its calculation of his custody credits. We affirm with directions.

**FACTS**

A. <u>BACKGROUND</u>

The victim was born in April 2010. In 2015, defendant was the victim's neighbor. The victim was friends with defendant's grandchildren (the grandkids), and she frequently played with the grandkids at defendant's home.

B. <u>FIRST INCIDENT</u>[2]

When the victim "was about five years old," she walked to defendant's house wearing a swimsuit. It was summer, and the grandkids were swimming in the pool.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The incidents are listed in the order in which the victim testified about them at trial, i.e., not necessarily in the order in which the incidents occurred.

2

The victim entered defendant's house and was walking toward the sliding door when defendant grabbed her wrist and pulled her toward him. Defendant placed his hand on the victim's genitals under her swimsuit and tried to kiss her cheek. The victim pushed defendant, but "he just kept his hand there" and then "forced himself with his lips on [her] cheek, and then after he . . . let [her] go, . . . [she] went to the backyard where everyone was." The victim did not tell anyone in the backyard about what happened.

### C.  THREAT

The following exchange occurred during the direct examination of the victim:

"[Prosecutor]:  Do you recall if the defendant, Mr. Samano, ever told you what [would] happen[] if you told someone?

"[The victim]:  Yes.

"[Prosecutor]:  Tell us about that.

"[The victim]:  It was mainly on the times where there wouldn't like be people, if that makes sense.  [¶]  And he had told me for the first time that if I were to tell somebody."

"[Prosecutor]:  What exactly do you remember the defendant telling you?

"[The victim]:  He had said if I were to tell anybody, he would kill my mom.

"[Prosecutor]:  Now, did you believe him at first when he said that?

"[The victim]:  I was scared, definitely.  And since he was—I viewed him as an adult, and I thought—well, maybe he could actually kill my mom."

"[Prosecutor]:  Do you remember generally when he told you that, around what age or how soon after these things started?

"[The victim]: It was in the beginning. I believe after the first time he had touched my private.

"[Prosecutor]: So would it be not long after the bathing suit incident?

"[The victim]: Yes."

D.     SECOND INCIDENT

When the victim was six years old, she played with the grandkids inside defendant's garage. After the children left to play elsewhere, the victim returned to the garage to retrieve her tablet, and defendant was in the garage. Defendant grabbed both sides of the victim's waist and pulled her to him. The victim was bent over, and defendant rubbed his clothed penis against the victim's buttocks over her clothing. The victim attempted to crawl away but did not succeed. Defendant's son walked into the garage. Defendant released his grip on the victim's waist, causing her to "kind of like f[a]ll. And [the victim] got up and . . . ran out of the garage."

E.     THIRD INCIDENT

The victim and one or two of defendant's grandkids were in a bedroom jumping on a bed. Defendant entered the room and tickled his granddaughter. Defendant then tickled the victim's abdomen and touched the upper portion of the victim's inner thigh. Defendant moved his face toward the victim's upper thigh as though he intended to kiss it. The victim tried to push defendant away from her and close her legs without the grandkids noticing what was happening. The victim used her feet to kick defendant, but she was unable to close her legs due to the placement of defendant's hands. Eventually, the victim was able to leave the bed.

## F.     FOURTH INCIDENT

Another time in a bedroom, defendant rubbed his hand back and forth along the victim's genitals, under her clothing.  With his other hand, defendant held the victim's thigh down.  The victim tried to move away, but defendant grabbed her and placed her back on the bed.

## G.     FIFTH INCIDENT

When the victim was seven years old, she was playing in a bedroom with one of defendant's granddaughters.  Defendant came into the room and put his hands inside the victim's shorts with the tips of his fingers inside her underwear.  Defendant touched the victim's genitals.  The victim pushed defendant away.  Defendant's granddaughter pushed defendant, and he almost fell off the bed, at which point defendant stopped.

## H.     MORE INCIDENTS

The victim estimated that defendant touched her genital area "about ten times," and four of those times involved skin-to-skin contact with rubbing.  The victim estimated that defendant touched her legs and other body parts at least 30 times.

For approximately six months, defendant's wife picked up the victim from the school bus stop and babysat her at defendant's house for one or two hours, until the victim's mother returned home from work.  The victim was five or six years old at the time.  When defendant's wife babysat the victim after school, typically, the only other person in the house was defendant.  During moments when defendant's wife went to the restroom and the victim was in the living room, defendant sat next to the victim and rubbed her upper thigh.  During times when defendant's wife went outside to water

5

plants, defendant touched the victim's genitals.  He usually touched the victim underneath her clothing, but sometimes he also touched her over her clothing.

I.      TELLING DEFENDANT TO STOP

During the direct examination of the victim, the following exchange occurred:

"[Prosecutor]:  Did you ever tell him to stop, that you didn't want him doing any of this?

"[The victim]:  Yes.

"[Prosecutor]:  And what, if anything, would he say?

"[The victim]:  He wouldn't say anything.  He would just kind of force himself."

J.      RESTRICTING THE VICTIM'S MOVEMENT

The victim recalled that defendant would "kind of, like, pin" the victim to restrict her movement.  The victim explained, "[I]f we were sitting down on a couch, he would put his hand on my waist and kind of pull me closer to him and like pin me to his body, if that makes sense."

K.      DISCLOSING THE ABUSE

The victim continued going to defendant's house because his grandkids "were the only friends [she] had basically."  In late 2017, when the victim started second grade, she made new friends and stopped going to defendant's house.  In April 2018, the victim was on the playground with one of her friends, and they were telling each other secrets.  The victim disclosed defendant's sexual abuse.  The victim's friend told her mother, and the friend's mother told the victim's mother, who contacted police.  The

6

victim did not previously disclose the abuse because she "would remember the time [defendant] had told [her] that he was going to do something to [her] mom."

## L. CLOSING ARGUMENT AND INSTRUCTIONS

In closing argument, the prosecutor argued, "Sometimes he actually used force, like he pulled her hand close to him to be able to touch her vagina. That's force. [¶] He also threatened to kill her mother, that's fear. He also is an older man and basically the authority figure in this next household. That's duress."

The prosecutor asserted there were four specific incidents of molestation that the victim recalled, but the prosecutor only listed three of them: (1) the swimsuit, (2) the garage, and (3) the tickling.[3] The prosecutor continued, "Now this is why in this case we charged eight counts. Because we know of at least four distinct things she talked about. But we also know that this happened many other times. . . . [¶] . . . Her recall . . . the other day was around 30 times. But considerably at a minimum, we charged eight counts." The trial court instructed the jury on the unanimity required when relying upon generic testimony. (CALCRIM No. 3501.)

---

[3] There are differing opinions regarding the number of specific incidents described by the victim. For example, on appeal, defendant's counsel identifies five specific incidents, but some of them differ from the five described *ante*. The difference appears to be caused by discrepancies in the descriptions of the incidents that were given by the victim during her May 2018 interview with a forensic interviewer versus the victim's June 2023 trial testimony. The differing opinions about the specific incidents are of little concern because the substantial evidence issue focuses on the victim's generic testimony—not her testimony about specific incidents.

**DISCUSSION**

A.    <u>SUBSTANTIAL EVIDENCE</u>

Defendant contends substantial evidence does not support the element of force, violence, duress, menace, or fear (§ 288, subd. (b)(1)) for the three generic testimony convictions.  The People concede there is not substantial evidence of force but contend there is substantial evidence of duress and fear.  We conclude there is substantial evidence of force.

Force, in the context of molestation, means " ' "constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act." ' " (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.)  " '[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force." (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024; *People v. Morales* (2018) 29 Cal.App.5th 471, 480.)

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

"Generic testimony" refers to testimony about a series of sexual offenses that fails to identify specific incidents.  For example, "intercourse occurred 'a lot' during

8

summer of 1984; these acts occurred 'more than three' times one summer." (*People v. Jones, supra*, 51 Cal.3d at p. 311.)  When assessing the sufficiency of generic testimony, we look for a description of "the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd conduct, intercourse, oral copulation or sodomy)." (*Id.* at p. 316.)  We analyze whether there is sufficient evidence in the victim's generic testimony to assure that force was applied during the molestations.

For approximately six months, defendant's wife babysat the victim after school, and defendant was typically the only other person in the house during that time.  In the moments when defendant's wife went to the restroom and the victim was in the living room, defendant sat next to the victim and rubbed her upper thigh.

Further, when speaking with the forensic interviewer, the victim said, "Uh, he started doing this [in] 2015 or 2016, every summer when I would go to my friend's house to be in the pool, he would grab my arm tight and pull me to the couch and he would do it."

The victim testified that defendant would "kind of, like, pin" the victim to restrict her movement:  "[I]f we were sitting down on a couch, he would put his hand on my waist and kind of pull me closer to him and like pin me to his body, if that makes sense."

The victim testified that defendant touched her legs and other non-genital areas of her body "probably more than 30" times.  When speaking with the forensic

interviewer, the victim said that defendant's touching was repetitive in terms of the same events reoccurring.

The foregoing evidence supports the conclusion that, when the victim was at defendant's house after school and in the summer, defendant would grab her, pull her to him, and pin her next to his body to accomplish his acts of molesting her. Defendant's actions in grabbing the victim, pulling her, pinning her against his body, and holding her there, constitute force. Therefore, substantial evidence supports the element of force for the three convictions.

B. PROSECUTORIAL MISCONDUCT

1. *PROCEDURAL HISTORY*

During closing argument, the prosecutor said to the jury, "Six years old, seven years old, eight years old. Ladies and gentlemen, at that time of a child's life, they should be worrying about what they're going to be getting for their birthday. Their biggest worry is whether they're not going to have the birthday party they wanted. Or if Santa is going to bring them the gift they wanted. Life at that stage of a child's life is about friends and playing and family and your favorite TV shows, your favorite TV movie. [¶] Life at that stage in your life shouldn't be about fearing someone that lives right next door to you as someone who by default is a constant presence on the only friends you have made thus far so far in life."

2. *ANALYSIS*

Defendant contends, "[I]n telling the jury that the victim should have been thinking of Santa, gifts, birthdays, friends and play, the prosecutor improperly appealed

10

to the jury to feel empathy for [the victim], her lost innocence.  This constituted

misconduct, violating appellant's constitutional right to a fair trial."**4**

"At closing argument a party is entitled both to discuss the evidence and to

comment on reasonable inferences that may be drawn therefrom." (*People v. Morales*

(2001) 25 Cal.4th 34, 44.)  " ' "It is, of course, improper to make arguments to the jury

that give it the impression that 'emotion may reign over reason,' and to present

'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its

proper role, or invites an irrational, purely subjective response.' " ' " (*People v. Vance*

(2010) 188 Cal.App.4th 1182, 1192.)  "Furthermore, . . . when the claim focuses upon

comments made by the prosecutor before the jury, the question is whether there is a

reasonable likelihood that the jury construed or applied any of the complained-of

remarks in an objectionable fashion." (*Morales*, at p. 44.)

One of the elements of the molestation offense is that the victim is "a child who

is under the age of 14 years." (§ 288, subds. (a) & (b).)  Thus, the victim's age is

legally relevant.  The evidence reflects that the victim was five years old when the

offenses in this case began.  The evidence also reflects that the victim played with dolls,

spent the summer playing in defendant's pool, bounced on beds for fun, played tag, and

played imagination games like house and store.  The victim's age and her childlike

---

**4** Defendant contends he did not forfeit this issue by failing to object because an objection would have been futile in that it would have called more attention to the allegedly problematic argument.  Alternatively, defendant asserts that if the issue was forfeited, then his trial counsel rendered ineffective assistance by failing to object.  We choose to address the merits of the prosecutorial misconduct contention.

hobbies were part of the evidence. The prosecutor's discussion of birthday parties and Santa Claus was no more evocative of an innocent childhood than the evidence already before the jury, i.e., it was not inflammatory rhetoric. Accordingly, there is not a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.

Defendant contends the prosecutor implied that the jury should feel sorry for the victim because her childhood innocence was taken from her. The prosecutor did not imply that the jury should feel sorry for the victim; rather, he commented on the evidence of the victim's age, which reflected she was five years old when the molestations began. (*People v. Wilson* (2005) 36 Cal.4th 309, 338 [A prosecutor has no obligation " ' "to shield the jury from all favorable inferences about the victim's life or to describe relevant events in artificially drab or clinical terms" ' "].) In sum, the prosecutor did not commit misconduct.

C.     CREDITS

Defendant contends the trial court erred in calculating his custody credits by failing to include two days: the day he was arrested (May 17, 2018) and the day of sentencing (December 6, 2023). The People concede defendant is correct.

" 'A defendant is entitled to actual custody credit for "all days in custody" in county jail and residential treatment facilities, including partial days.' [Citation.] 'Calculation of custody credit begins on the day of arrest and continues through the day of sentencing.' [Citation.] ' "The law takes no notice of fractions of a day. Any

fraction of a day is deemed a day." ' " (*People v. Valdes* (2020) 53 Cal.App.5th 953, 955.)

There are 2,030 days from May 17, 2018, through and including December 6, 2023. The trial court calculated defendant's custody credits as 2,028 days. Thus, the trial court erred by excluding two days from defendant's custody credits. We will direct the trial court to correct the error.

## DISPOSITION

The trial court is DIRECTED to (1) correct defendant's presentence actual time-served custody credits to 2,030 days, (2) correct the total presentence credits to 2,334 days (2,030 actual + 304 conduct = 2,334), and (3) send a corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

13