Filed 11/23/20  P. v. Angeles CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SEVERO PRUDENTE ANGELES,<br><br>    Defendant and Appellant. | B293739<br><br>(Los Angeles County Super. Ct. No. VA144769) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Severo Prudente Angeles appeals from a judgment entered after a jury convicted him of 11 counts of lewd acts on children under the age of 14. (Pen. Code, § 288, subds. (a), (b)(1).)[1] Angeles argues: (1) the evidence was insufficient to support his convictions on the three counts of forcible lewd acts in violation of section 288, subdivision (b)(1); (2) the trial court erred in admitting Angeles's entire audio recorded interview, including the interrogating officer's assertions of his guilt; and (3) the trial court erred in imposing mandatory consecutive terms on two of the section 288, subdivision (b)(1) counts without determining whether the forcible lewd acts occurred on separate occasions. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *The Charges*

In an amended information, Los Angeles County District Attorney charged Angeles with eight counts of a lewd act on a child under the age of 14 (§ 288, subd. (a); counts 2-5 and 8-11), and three counts of a forcible lewd act on a child under the age of 14 (§ 288, subd. (b)(1); counts 1, 6, and 7). The amended information alleged that Angeles committed the offenses against multiple victims within the meaning of section 667.61, subdivisions (b) and (e), and section 1203.066, subdivision (a)(7). The amended information further alleged that Angeles had substantial sexual conduct with three of the victims within the meaning of section 1203.066, subdivision (a)(8). Angeles pleaded not guilty to each count and denied the enhancement allegations.

---

[1] Undesignated statutory references are to the Penal Code.

B.     *The Prosecution's Case-in-Chief*

1.     *Acts Against Jennifer (Counts 1-3)*

Angeles was married to Jennifer's maternal aunt. Starting at the age of four, Jennifer resided in a house in Pico Rivera with her parents and younger sister, Stephanie. Angeles resided with his wife and four children in a converted garage behind Jennifer's house. When Jennifer was five years old, she was alone with Angeles in a closet inside his house. Angeles grabbed Jennifer by her hair, pushed her head down, and made her "suck on his penis." One to two weeks later, Jennifer was in the bedroom of Angeles's son. Angeles showed Jennifer a pornographic videotape depicting an act of oral copulation. While the videotape was playing, Angeles grabbed Jennifer's hands and tightly held them so that she could not move away. Angeles then made Jennifer "put [her] mouth on his penis." On two other occasions, Angeles placed his hand inside Jennifer's underwear and touched her vagina with his fingers.

When Jennifer was eight years old, Angeles took her to buy a scooter. While Jennifer was in the back seat of Angeles's van, Angeles sat next to her and caressed her face. He then grabbed Jennifer by the back of her neck and "tried to force [her] to kiss him." Although Jennifer attempted to push Angeles away, she could not do so, and he put his tongue inside her mouth. On another occasion when Jennifer was eight years old, she went into an alley behind Angeles's house to retrieve a ball. Angeles grabbed Jennifer by the back of her neck "the same way he did before" and "made [her] kiss him." He then pulled down his pants and "made [her] suck on his penis." Jennifer also recalled other occasions when Angeles caressed her face and kissed her on the mouth.

When Jennifer was 15 years old, she told her mother that Angeles made her feel uncomfortable, but did not disclose any details at that time. The following year, one of Jennifer's teachers asked the students to write about something they had never told anyone. Jennifer wrote about Angeles inappropriately touching her when she was very young.

After Jennifer's teacher reported Jennifer's disclosure to the police, Detective Cynthia Toone of the Special Victims Bureau investigated the case. As part of her investigation, following Angeles's arrest, Detective Toone conducted an audio recorded interview of Angeles at the Pico Rivera Sheriff's Station.[2] During the interview, Angeles admitted that, when Jennifer was around five years old, he inappropriately touched Jennifer on multiple occasions, including touching her vagina, making her touch his penis with her hand, and placing his penis inside her mouth.

2. *Acts Against Stephanie (Counts 4-5)*

Stephanie is Jennifer's younger sister. When Stephanie was five or six years old, Angeles was helping her get a bicycle from the side of the house when he suddenly put his hand inside her underwear. Angeles then inserted his finger into Stephanie's vagina, causing her pain. On another occasion, Angeles and Stephanie were alone in the patio. Angeles placed his hand over Stephanie's pants and touched her vagina through her clothing. Afterward, he told her to "forget about this." Stephanie did not disclose these incidents to anyone until she heard about what

---

[2] Detective Toone conducted the interview in Spanish. As part of their case, the People played the audio recording of the interview and provided the jury with a transcript of the recording translated from Spanish to English.

4

happened to Jennifer.  In his interview with Detective Toone, Angeles denied he ever inappropriately touched Stephanie.

   3.    *Acts Against Crystal (Counts 6-9)*

Crystal's family is related to Angeles's wife.  As a young child, Crystal often visited Angeles's residence to attend family gatherings and to play with Jennifer and Stephanie.  When Crystal was six years old, she was in the backyard behind Angeles's house.  Angeles approached Crystal, slid his hand down the back of her pants, and touched her buttocks.  On another occasion, Crystal was playing by herself in the backyard when Angeles approached her.  Angeles pulled down Crystal's pants, inserted his finger into her vagina, and "moved it around."

There were also times when Angeles touched Crystal while she was alone with him in his van.  When Crystal was seven years old, Angeles called her over to his van, which was parked in the backyard.  Once inside the van, Angeles slid his hand down the front of Crystal's pants and inserted his fingers into her vagina.  Crystal said "no," but Angeles did not stop.  When Crystal was eight years old, Angeles again took her into his van. He then pulled down Crystal's pants and rubbed her vagina with his hand.

On two occasions, Angeles forced Crystal to touch his penis. When Crystal was seven years old, Angeles "grabbed [her] hand," "put it in his front pants," and then "rubbed his . . . penis" with her hand.  On another occasion, Angeles pulled Crystal's hand to his penis and made her rub it.  Although Crystal told Angeles to stop, he "didn't listen."  Crystal also tried pulling her hand away, but Angeles kept her from doing so.

When Crystal's family first asked her if Angeles had ever touched her, she denied it because she did not think anyone

5

would believe her.  Crystal later disclosed the molestation to her sister and then to Detective Toone.  In his interview with Detective Toone, Angeles denied having any inappropriate contact with Crystal.

### 4.    *Acts Against Esperanza (Counts 10-11)*

Esperanza is Angeles's daughter.  When Esperanza was 10 years old, Angeles twice touched her in a manner that made her feel uncomfortable.  One incident occurred while Esperanza was sitting in the living room and doing schoolwork at her computer.  Angeles approached Esperanza from behind and briefly caressed her breasts over her clothing with his hands.  During the second incident, Angeles was in a locked room with Esperanza and "had pinned [her] down" on the floor.  He touched her breasts and her thigh with his hands.  When Esperanza's mother tried to enter the room, she could not do so because the door was locked.  Her mother argued with Angeles over the incident and forced him to move out.  A few months later, Angeles returned home, apologized to Esperanza, and "from there [they] just moved on."

At trial, Esperanza testified that she had been close with Jennifer and Stephanie, and they never told her about any abuse by her father.  She also stated that both girls acted comfortably around Angeles until they made the recent allegations about him.  Esperanza stated that she knew Crystal, but rarely spoke to her.  She further testified that Crystal had only visited their house on one or two occasions for large family gatherings.

Esperanza denied Angeles ever touched her vagina.  However, in his interview with Detective Toone, Angeles admitted that he touched Esperanza's vagina approximately three times when she was four or five years old.  He also stated that, after Esperanza told her mother about the touching, he

6

apologized to Esperanza in front of her mother and promised them he would never do it again.[3]

C.    *The Defense Case*

Angeles denied touching any of the girls in a sexual manner.  He first learned of the accusations when Jennifer's mother told his family about the alleged touching of Jennifer. The police arrested Angeles two weeks later and placed him in a holding cell at a police station.  At some point, the police took him to an interview room where he met Detective Toone.  According to Angeles, he lied when he told Detective Toone that he had inappropriately touched Jennifer and Esperanza.  He falsely admitted to those acts because Toone "promised [him] that she would help [him] once the interview was over[;] she was going to go to her house and [he] would go to [his]."  Detective Toone made this promise when Angeles entered the interview room and the tape recorder was off.  Angeles accepted the promise because Detective Toone used "an intimidating manner against [him]," and he was "easy prey" for her given that he had "never been in a situation such as this" and "did not know if [he] . . . had any right."  Angeles believed that certain adults who did not want him to "make true the dreams that [he] was working on for [his] family" convinced the girls to make false accusations against him. On cross-examination, however, Angeles admitted Esperanza was telling the truth when she testified about Angeles "groping" her

---

[3]    When Detective Toone interviewed Angeles, she was aware of molestation allegations by Jennifer, Stephanie, and Crystal. However, she did not know of any allegations involving Esperanza until Angeles disclosed those acts in his interview.

breasts and "touching" her in a locked room before being interrupted by his wife.

Angeles also called two other witnesses to testify. The police officer who first interviewed Jennifer about her report testified that, during her interview, Jennifer did not accuse Angeles of touching her vagina. Angeles's eldest son, Juan, testified that, when Jennifer and Stephanie lived on the same property as his family, the girls never appeared to be uncomfortable around Angeles. Juan also testified that Crystal only came over when there were parties attended by a lot of people, and she was never alone with Angeles. None of the girls, including Esperanza, ever complained about Angeles to Juan.

D.   *The People's Rebuttal Case*

On rebuttal, Detective Toone testified that the audio interview recording comprised the complete record of her interactions with Angeles. Detective Toone did not have any conversation with Angeles before the recording started or after it stopped, and she did not modify the recording in any way. She did not promise Angeles he would be allowed to go home if he simply answered yes to all of her questions.

E.   *The Jury Verdict and Sentencing*

The jury found Angeles guilty on all 11 counts, and found the enhancement allegations true. The trial court sentenced Angeles to an aggregate term of 75 years to life in state prison consisting of five consecutive terms of 15 years to life on counts 1, 4, 6, 7, and 10 and concurrent terms of 15 years to life on all remaining counts.

Angeles timely appealed.

8

## DISCUSSION

A. *There Was Substantial Evidence To Support Angeles's Convictions for Committing Forcible Lewd Acts*

Angeles challenges the sufficiency of the evidence supporting his convictions for forcible lewd acts against Jennifer (count 1) and Crystal (counts 6 and 7) under section 288, subdivision (b)(1). Angeles contends his convictions on these counts must be reversed because the evidence was insufficient to establish that he had used the requisite physical force in committing the lewd acts.

### 1. *Standard of Review*

""""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."""" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.) "[O]ur task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ""be reasonably reconciled with the defendant's innocence."" [Citations.] The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the

9

defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)

2.  *Substantial Evidence Supports the Convictions*

a.  *Applicable Law*

Section 288, subdivision (a), prohibits any person from committing a lewd or lascivious act on a child under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." Section 288, subdivision (b)(1), further prohibits the commission of such lewd or lascivious act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." "'Force, in this context, means physical force that is "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.'"'" *(People v. Jimenez* (2019) 35 Cal.App.5th 373, 391; accord, *People v. Soto* (2011) 51 Cal.4th 229, 242 (*Soto*) ["[t]his formulation was, and remains, an appropriate definition of the force required for an aggravated lewd conduct conviction under section 288(b), now section 288(b)(1)"].)[4]

"'A defendant uses "force" if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the

---

[4]  In *Soto*, the Supreme Court held, "Honoring the clear legislative intent expressed in the plain language of section 288(b)(1), we hold that consent of the victim is not a defense to the crime of aggravated lewd conduct on a child under age 14. The prosecution need not prove that a lewd act committed by use of force, violence, duress, menace, or fear was also against the victim's will." (51 Cal.4th at p. 248.)

physical contact which is inherent in the prohibited act.' [Citation.] 'The evidentiary key to whether an act was forcible is not whether the distinction between the "force" used to accomplish the prohibited act and the physical contact inherent in that act can be termed "substantial." Instead, an act is forcible if force facilitated the act rather than being merely incidental to the act.'" (*People v. Morales* (2018) 29 Cal.App.5th 471, 480; accord, *People v. Jimenez, supra,* 35 Cal.App.5th at p. 391; *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024.) "[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" are sufficient to support a finding that the lewd act was committed by means of force." (*People v. Alvarez* (2009) 178 Cal.App.4th 999.) The court in *Alvarez* stated that the defendant's actions of resisting the victim's attempts to push him away when he attempted to kiss her, holding her while he digitally penetrated her, and continuing to put her hand on his penis whenever she moved it away were sufficiently distinct from the lewd conduct to constitute use of force. The court concluded this evidence supported the defendant's conviction for committing a forcible lewd act on a child. (*Id.* at p. 1005.)

Angeles concedes that, in committing the acts charged in counts 1, 6, and 7, he "used some slight degree of force beyond that which was absolutely necessary for and/or inherent in the unlawful touching itself." Citing *People v. Schulz* (1992) 2 Cal.App.4th 999 (*Schulz*) and *People v. Senior* (1992) 3 Cal.App.4th 765 (*Senior*), Angeles contends, however, that "there was insufficient evidence that counts 1, 6, or 7 were forcible because [he] did not use force 'substantially different or substantially greater than that necessary to accomplish the lewd act itself.'" His reliance on these cases is misplaced.

11

In *Schulz, supra*, 2 Cal.App.4th 999, the evidence showed the defendant "awakened the victim by grabbing her arm, cornered her while she cried, held her arm, and touched her breasts and vaginal area." (*Id*. at p. 1004.) In concluding there was insufficient evidence of force in the commission of the lewd act, the Sixth District reasoned: "We do not regard as constituting 'force' the evidence that defendant grabbed the victim's arm and held her while fondling her. [Citations.] The 'force' factor differentiates the charged sex crime from the ordinary sex crime. Since ordinary lewd touching often involves some additional physical contact, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.'" (*Ibid*.)

Relying on *Schulz*, the Sixth District reached a similar conclusion in *Senior, supra,* 3 Cal.App.4th 765. In that case, the defendant engaged in multiple acts of oral copulation with the victim during which she "tried to pull away," but he "pulled her back" and "held her shoulders." (*Id*. at p. 771.) The court concluded the evidence was insufficient to establish the requisite use of force, explaining: "Since ordinary oral copulation and digital penetration almost always involve some physical contact other than genital, a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force.' There was no evidence here of any struggle, however brief." (*Id*. at p. 774.) In both *Schulz* and *Senior*, the Sixth District acknowledged that its interpretation of "force" was contrary to precedent holding that acts of grabbing, holding, or restraining can be sufficient to constitute a use of force within the meaning of section 288, subdivision (b). (*Schulz, supra*, 2 Cal.App.4th at p. 1004; *Senior*, at p. 774.)

12

The narrow definition of "force" set forth in *Schulz* and *Senior* has been uniformly criticized. (*People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1027; *People v. Alvarez, supra,* 178 Cal.App.4th at pp. 1004-1005; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1789-1790, disapproved on other grounds in *Soto, supra,* 51 Cal.4th at p. 248, fn. 12; *People v. Babcock* (1993) 14 Cal.App.4th 383, 388.) As one appellate court explained: "[T]he fatal flaw . . . in the analyses in *Schulz* and *Senior*[ ] is in their improper attempt to merge the lewd acts and the force by which they were accomplished as a matter of law. Unlike the court in *Schulz*, we do not believe that holding a victim who was trying to escape in a corner is necessarily an element of the lewd act of touching her vagina and breasts. Unlike the court in *Senior*, we do not believe that pulling a victim back as she tried to get away is necessarily an element of oral copulation." (*People v. Babcock, supra,* at p. 388.) Even the Sixth District has since rejected this aspect of its analyses in *Schulz* and *Senior*, stating: "we respectfully disagree with the interpretation of the 'force' requirement of section 288, subdivision (b) discussed in *Schulz* and *Senior*. . . . '. . . As used in that subdivision, "force" means "physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself."'" (*People v. Bolander* (1994) 23 Cal.App.4th 155, 160-161, disapproved on other grounds in *Soto*, at p. 241, fn. 12; accord, *People v. Aguilar, supra,* 41 Cal.App.5th at p. 1027 ["*Shulz's* contrary conclusion is mystifying . . . *Senior* followed *Shulz* and is just as baffling. . . . We reject *Shulz* and *Senior*"]; see *People v. Morales, supra,* 29 Cal.App.5th at p. 480 ["this court's brief discussion of force in [*Shulz*] was dicta since this court held that there was substantial evidence of duress"].)

Accordingly, as California courts repeatedly have recognized, "'[a]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force." (*People v. Morales, supra,* 29 Cal.App.5th at p. 480 ["defendant's 'grabbing, holding, and restraining' of Jane Doe 1 to facilitate his lewd act was substantial evidence of the requisite force"]; accord, *People v. Jimenez, supra,* 35 Cal.App.5th at p. 393 [jury reasonably could infer defendant used physical force where victim "testified that she tried pushing [defendant] away, and although that would make him stop, 'he would try again and try again' right away"]; *People v. Garcia, supra,* 247 Cal.App.4th at p. 1024 [the defendant's acts of grabbing the victim's hands to keep her from moving while he touched her vagina and holding her on the floor with his body while he placed his penis on her vagina supported conviction for forcible lewd conduct]; *People v. Alvarez, supra,* 178 Cal.App.4th at p. 1005 [sufficient evidence of force where defendant "grabbed [victim's] hand and made her hold his penis," and "[w]henever she let go, he took her hand and brought it back to his genital area"]; *People v. Bolander, supra,* 23 Cal.App.4th at p. 159 ["we conclude that defendant's acts of inhibiting Ryan from pulling his shorts back up, bending Ryan over, and pulling Ryan towards him constitute force within the meaning of subdivision (b) of section 288"]; *People v. Neel, supra,* 19 Cal.App.4th at p. 1790 ["defendant's acts of forcing the victim's head down on his penis when she tried to pull away and grabbing her wrist, placing her hand on his penis, and then 'making it go up and down' constitute force" within meaning of section 288, subdivision (b)]; *People v. Babcock, supra,* 14 Cal.App.4th at p. 386 [substantial evidence supported defendant's convictions for

forcible lewd acts where "evidence demonstrate[d] defendant grabbed [victims'] hands and forced them to touch his genitals"].) Consistent with these authorities, we conclude Angeles's convictions under counts 1, 6, and 7 are supported by substantial evidence.

b. *Jennifer*

As to count 1 involving Jennifer, the People's theory at trial was that Angeles used force in committing a lewd act either (1) when he grabbed Jennifer's face and pulled her toward him to forcibly kiss her, or (2) when he grabbed Jennifer's head and pulled it to make her orally copulate him. With respect to the first incident, Jennifer testified that, when she was eight years old, she was alone with Angeles in the back seat of his van after he took her to buy a scooter. While sitting next to Jennifer, Angeles "grabbed [her] by the back of [her] neck," he then "came in closer," and "tried to force [her] to kiss him." Jennifer described the "grabb[ing]" as "throwing [her]." Jennifer "tried to push away, but [she] couldn't." Angeles then "came in to kiss [her] with his tongue" in "[her] mouth." With respect to the second incident, Jennifer recounted that, on another occasion when she was eight years old, Angeles approached her in an alley behind his house and pulled down his pants. He "grabbed [Jennifer] from the back of [her] neck . . . the same way he did before."[5] Angeles then "made [her] kiss him and he made [her] suck on his penis."

---

[5]     Regarding the prior incident, Jennifer testified: "he had his pants down . . . he had my hands . . . my hands were in his palms, so he grabbed me . . . I couldn't do anything . . . I had like to put my mouth on [his penis] cause I didn't know what he would do to me. So I put my mouth on his penis. . . . He had my hands, so I

15

Jennifer's testimony provided substantial evidence that Angeles used physical force in conjunction with these lewd acts that was substantially different from or substantially greater than that necessary to accomplish the lewd act itself. In forcibly kissing Jennifer, Angeles grabbed her by the back of her neck and pulled her toward him even as she resisted by trying to push him away. In forcing Jennifer to orally copulate him, Angeles again grabbed Jennifer by the back of her neck and made her put her mouth on his penis. Her hands were in his palms as in the prior oral copulation incident. Because the grabbing and restraining of Jennifer "facilitated" Angeles's lewd acts "rather than being merely incidental to the act," it is sufficient to constitute force within the meaning of section 288, subdivision (b)(1). Accordingly, sufficient evidence supported Angeles's conviction under section 288, subdivision (b)(1). (*People v. Jimenez, supra*, 35 Cal.App.5th at p. 391; *People v. Morales*, *supra*, 29 Cal.App.5th at p. 480.)

### c. *Crystal*

As to counts 6 and 7 involving Crystal, the People's theory was that Angeles used force in committing a lewd act on the two occasions when he grabbed Crystal's hand, placed it on his penis, and made her use her hand to rub his penis. At trial, Crystal testified that, when she was seven years old, Angeles "grabbed [her] hand, put it in his front pants and then he rubbed his [penis]" with her hand. Although Crystal tried "to pull [her] hand away," Angeles "didn't let [her]." Angeles was "holding [her] hand in his pants." Crystal was not strong enough to pull

couldn't move away. . . . I couldn't [move away] 'cause he held on tight."

16

her hand away.  Crystal further testified that, on another occasion, he did "the same thing."  Angeles again "put [her] hand [on] his penis," and made her rub his penis with her hand. Crystal was "telling [Angeles] no" as he did this, but "he still didn't listen."  Crystal tried to pull away, but she "wasn't able to" because Angeles "pulled [her] hand and kept it there."  Crystal testified "it was hard" to pull her hand away.  On both occasions, Angeles forced Crystal to "rub" his penis with her hand.

From this evidence, the jury reasonably concluded that Angeles used force in committing the lewd acts charged in counts 6 and 7.  On each occasion that Angeles forced Crystal to touch his penis, Crystal tried to resist him by pulling her hand away and/or telling him no.  Angeles was able to overcome Crystal's resistance by pulling her hand back toward his genital area, holding it in place, and then rubbing his penis with her hand. Angeles's act of grabbing, holding, and manipulating Crystal's hand to make her rub his genitals was a use of physical force beyond that necessary to accomplish the lewd act itself.  (*People v. Alvarez*, *supra*, 178 Cal.App.4th at p. 1005; *People v. Neel*, *supra*, 19 Cal.App.4th at p. 1790; *Babcock*, *supra*, 14 Cal.App.4th at p. 385.)  Substantial evidence therefore supports Angeles's convictions for forcible lewd acts in violation of section 288, subdivision (b)(1).

> B. *The Trial Court Did Not Err in Admitting Detective Toone's Entire Interview With Angeles, and Any Error Was Harmless*

Angeles asserts the trial court prejudicially erred in admitting the entire audio recorded interview with Detective Toone.  He argues the trial court should have excluded Detective

Toone's statements in the interview expressing her certainty about the victims' credibility and Angeles's guilt.

### 1.     *Relevant Proceedings*

Prior to the start of trial, Angeles's counsel objected to the admission of the complete, unedited audio recording of Angeles's interview with Detective Toone.  While acknowledging that Angeles's own statements in the interview were admissible, Angeles argued that Detective Toone's statements that Angeles was lying and the victims were telling the truth should be redacted because they constituted improper "vouching for the credibility of witnesses in the case" and could infringe upon the jury's independent assessment of witness credibility.  Angeles also objected to Detective Toone's statements in the interview about what the victims said to her on the ground that they were inadmissible hearsay.

The People responded that it would be difficult to redact the challenged portions of the recording "without making [it] unintelligible" because Toone's statements were interspersed throughout the interview.  The People also argued that Detective Toone's remarks that she had spoken to the victims and believed what they said did not reflect improper vouching, but rather were part of a permissible interrogation technique.  In addition, the People asserted that the complete interview was admissible because it provided necessary context for the jury to understand that Angeles "wasn't somehow manipulated, coerced into saying these things."

The trial court admitted the entirety of the interview, consisting of a one-hour and 39-minute audio recording and an 80-page transcript.  The trial court also instructed the jury:  "You have been presented with a recorded interrogation which

18

included statements made by Detective Toone about the credibility of witnesses in this case. The recorded statements made by Detective Toone during the interrogation were presented for the sole purpose of giving context to the defendant's responses. You are not to consider these statements for any other purpose."

### 2. *Standard of Review*

A trial court is vested with broad discretion in ruling on the admissibility of evidence. (*People v. Fayed* (2020) 9 Cal.5th 147, 189.) "'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice."'" (*People v. Young* (2019) 7 Cal.5th 905, 931.) "'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'" (*People v. Jones* (2013) 57 Cal.4th 899, 949.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional . . . test [set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836]: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; accord, *People v. Powell* (2018) 5 Cal.5th 921, 951 ["[w]hen evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error"].)

19

### 3. There Was No Prejudicial Error in the Admission of Angeles's Interview with Toone

Angeles contends the trial court improperly admitted Detective Toone's hearsay statements made during the interview in which she offered her opinion that the victims' claims were credible and Angeles's denials were false. Angeles argues that, in making these statements, Detective Toone "went beyond the common practice of an interrogator telling a suspect he is clearly guilty and therefore should confess" by "invoking her decades of experience interviewing victims and suspects in sex abuse cases to explain how she knew, based on the way the girls spoke, looked and cried, that they were speaking the truth, and that she knew, based on looking at Mr. Angeles's face and eyes, that . . . he was guilty."[6] Angeles further claims the erroneous admission of this

---

[6] Angeles points to Detective Toone's statements: (1) "I do believe what Jennifer is saying because she gave me a lot of details"; (2) "I read people. . . . And to me, I notice in your face that you know exactly what you did"; (3) "No, I know you do remember, I know. Seeing the look on your face right now, it's that you do remember"; (4) "I know that [Jennifer] is telling me the truth! One hundred percent! One hundred percent!"; (5) "Look, like I tell you, I know that [Jennifer] is telling me the truth"; (6) "I know that these things happened"; (7) "You not only did it with Jennifer, I know you did it with Stephanie and with Cr[y]stal"; (8) "[Crystal] didn't want to tell, but she knew that she had to tell the truth. And in talking with her, children don't shed false tears"; (9) "I know in my heart that everything that [Jennifer] told me is true!"; (10) "[W]hen I saw in her eyes, and her pain and her tears, I knew that [Jennifer] was telling me the truth"; (11) "And that is when I know one hundred percent or two hundred percent that the abuse really did happen."

20

evidence rendered his trial fundamentally unfair, requiring the reversal of each of his convictions.

"[G]enerally a lay witness may not express an opinion about the veracity of another person's statement because the statement's veracity is for the jury to decide." (*People v. Houston* (2012) 54 Cal.4th 1186, 1221; see also *People v. Melton* (1988) 44 Cal.3d 713, 744 ["[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue"].)  For instance, a testifying officer generally may not offer a personal opinion regarding the credibility of the defendant or a witness. (*People v. Stitely* (2005) 35 Cal.4th 514, 546; *People v. Smith* (1989) 214 Cal.App.3d 904, 915; *People v. Sergill* (1982) 138 Cal.App.3d 34, 40.)  Similarly, "[a] witness may not express an opinion on a defendant's guilt." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)  The Supreme Court has explained: "With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence.  Qualified experts may express opinions on issues beyond common understanding [citations] but lay views on veracity do not meet the standards for admission of expert testimony." (*People v. Melton*, at p. 744.)  "[A] lay opinion about the veracity of particular statements . . . has no 'tendency in reason' to disprove the veracity of the statements." (*Ibid.*)

An officer's statements to a defendant during an interview, however, may be admissible to provide context for the defendant's answers.  (*People v. Maciel* (2013) 57 Cal.4th 482, 524 (*Maciel*).)  In *Maciel*, the defendant argued the trial court prejudicially erred when it failed to redact the interrogating officers' statements that implied unidentified informants had reported that the defendant was responsible for arranging the crimes at issue.  (*Id.* at p. 523.)

21

In rejecting this argument, the Supreme Court held: "[C]ontrary to defendant's assertion, the officers' statements that defendant had 'set . . . up' the murders in this case were not 'inadmissible hearsay.' Rather, they served the nonhearsay purpose of giving context to defendant's responses. [Citation.] Moreover, the court instructed the jury that law enforcement officers were permitted to misrepresent evidence in their possession in order to motivate a suspect to confess, and that the officers' 'allegation[s]' in this case were '*not received for the truth of any allegation* but because it is part of the statement and helps you judge the response of the defendant.' . . . Thus, there is no reasonable likelihood the jury 'would consider [the] investigators' statements on the [tape] as substantive evidence of [defendant's] guilt.'" (*Id*. at p. 524; see *People v. Riccardi* (2012) 54 Cal.4th 758, 801, fn. 21 [detective's statements in recorded interview were properly "admitted for the nonhearsay purpose of giving context to [the interviewee's] answers"], overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Here, Detective Toone's statements in the interview expressing that she knew the witnesses were telling the truth and Angeles was lying did not constitute inadmissible hearsay. Rather, the statements were offered for the nonhearsay purpose of providing the jury with context for Angeles's responses, which evolved over the course of the interview from vehement denials of any wrongdoing to substantial admissions that he committed multiple lewd acts against Jennifer and his daughter, Esperanza. While the better practice would have been to excise certain of Detective Toone's statements, given Angeles's confession, the trial court reasonably could have concluded that the entirety of the recorded interview should be admitted to allow the jury to

22

evaluate the context of the incriminating statements that Angeles made in response to Detective Toone's assertions about his guilt. Indeed, Angeles argues while he "eventually made inculpatory admissions," "his claim that he had been pressured into admitting something was not entirely implausible." He further asserts, "His initial admissions were consistent with his defense, that he was just acceding to pressure and trying to admit to whatever it was that Detective Toone believed he had done." It would have been difficult for the jury to evaluate Angeles's admissions during the interview without hearing both sides of the conversation. Under these circumstances, although it would have been an easy matter and the better practice to limit Detective Toone's statements, the trial court could have reasonably concluded that it was necessary for the jury to hear the entire interview to determine whether Detective Toone "pressured" Angeles into making the "admissions."

Moreover, as in *Maciel, supra*, 57 Cal.4th 482, the trial court instructed the jury that Detective Toone's interview statements "were presented for the sole purpose of giving context to the defendant's responses," and the jury was "not to consider these statements for any other purpose." We presume the jury followed the court's instruction. (*Maciel*, at p. 524; see *People v. Case* (2018) 5 Cal.5th 1, 37 [detectives' statements in a witness interview "express[ing] their belief that defendant had committed the crimes was not unduly prejudicial because the court carefully instructed the jurors they were not to consider this evidence for its truth, but only to demonstrate [the witness's] state of mind"].) In addition, Detective Toone testified at trial that her interview statements were part of an interrogation technique designed to elicit a confession, and at the time of interview, she had not yet

had an opportunity to speak with each complaining witness to assess their credibility. Under these circumstances, there was no reasonable likelihood the jury would have considered Toone's statements as substantive evidence of either the witnesses' veracity or Angeles's guilt.

### 4. *Any Error Was Harmless*

Finally, even assuming any specific portions of Detective Toone's interview statements should have been redacted, any error in admitting the statements was harmless. We review the erroneous admission of evidence under the harmless error standard of *People v. Watson, supra,* 46 Cal.2d at p. 836. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 118; *People v. Houston* (2012) 54 Cal.4th 1186, 1222; *People v. Fuiava* (2012) 53 Cal.4th 622, 671; *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1535.) Under *Watson,* "'[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.'" (*People v. Watson* (2008) 43 Cal.4th 652, 686; accord, *People v. Partida* (2005) 37 Cal.4th 428, 439.) As discussed, Angeles ultimately confessed in the interview that he had sexually molested Jennifer and Esperanza. With respect to Jennifer, Angeles admitted the molestation included touching her vagina, making her touch his penis with her hand, and placing his penis inside her mouth. With respect to Esperanza, Angeles admitted he inappropriately touched his daughter's vagina on multiple occasions when she was four or five years old, and that he stopped when he was caught in the act by his wife. Although Angeles denied that he ever touched Stephanie or Crystal, their descriptions at trial were similar in many respects to Jennifer's testimony. In each case, the molestation began when the girls were between the ages of four and six, involved

24

similar lewd acts, and generally took place in Angeles's van or secluded areas of his backyard. The four victims provided graphic and independent accounts of Angeles's lewd acts. Given the overwhelming evidence of guilt, any error in admitting Detective Toone's interview statements did not render the trial fundamentally unfair, nor it is reasonably probable that Angeles would have obtained a more favorable result had the Detective Toone's statements been excluded. (*DeHoyos*, at p. 118; *People v. Watson*, *supra*, 43 Cal.4th at p. 686; see Evid. Code, § 353, subd. (b).)[7]

C. *The Trial Court Did Not Err in Imposing of Consecutive Sentences on Counts 6 and 7*

Angeles challenges the trial court's decision to impose consecutive terms of 15 years to life on counts 6 and 7 for committing forcible lewd acts against Crystal. Angeles contends the trial court failed to determine whether Angeles committed the forcible lewd acts in counts 6 and 7 on separate occasions within the meaning of sections 667.6 and 667.61. Angeles argues remand is necessary because, if the acts in those counts occurred on a single occasion, the trial court has the discretion to impose a concurrent or a consecutive sentence.

---

[7] Angeles's reliance on *People v. Smith* (1989) 214 Cal.App.3d 904 and *People v. Sergill* (1982) 138 Cal.App.3d 34 is misplaced because the trial courts permitted in-court lay opinion testimony about the victim's veracity. There was no audio recorded confession in which the defendant admitted his guilt, and the interrogator's statements were needed to understand the context of those admissions.

25

1. *Applicable Sentencing Scheme*

Section 667.61 mandates an indeterminate term of 15 years to life when the defendant is convicted of committing certain enumerated sex offenses against more than one victim, including forcible lewd act in violation of section 288, subdivision (b). (§ 667.61, subds. (b), (e)(4).)  The statute further provides that, for the offense of forcible lewd act in violation of section 288, subdivision (b), "the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i).)[8]  Section 667.6, subdivision (d), in turn provides that "[i]n determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack,

---

[8]     Section 667.61, subdivision (i), provides:  "For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive, of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."  (§ 667.61, subd. (i).)  While a violation of section 288, subdivision (b) falls within this sentencing provision (*id.*, subd. (c)(4)), a violation of section 288, subdivision (a) does not (*id.*, subd. (c)(8).)  (See *People v. Zaldana* (2019) 43 Cal.App.5th 527, 536.)

shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Accordingly, when the defendant is convicted of multiple counts of forcible lewd acts in violation of section 288, subdivision (b), against the same victim, the trial court is required to impose a mandatory consecutive term for each count if it determines the crimes occurred on separate occasions. (§ 667.61, subds. (i), (c)(4); *People v. Zaldana, supra,* 43 Cal.App.5th at p. 536.) If, however, the court determines the crimes occurred on a single occasion, it retains the discretion to impose concurrent or consecutive terms. (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 214; *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.) A reviewing court will not reverse a trial court's determination that the defendant committed the offenses in question on separate occasions unless "'no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior.'" (*People v. King* (2010) 183 Cal.App.4th 1281, 1325; see *People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

> 2. *The Trial Court Did Not Err Because There Was No Evidence that Angeles Committed the Offenses in Counts 6 and 7 on the Same Occasion*

The trial court sentenced Angeles to consecutive terms of 15 years to life on counts 1, 4, 6, 7, and 10, and concurrent terms of 15 years to life on all remaining counts pursuant to section 667.61. Angeles does not contend there was insufficient evidence to conclude that the offenses in counts 6 and 7 involving Crystal "did occur on separate occasions." Rather, he claims the trial court failed to exercise its discretion to determine whether the

27

offenses occurred on separate occasions, and if they did not, whether consecutive or concurrent terms should be imposed because consecutive sentences "were discretionary if [the forcible lewd acts] involved the same victim on the same occasion." The People respond that Angeles forfeited this claim by failing to timely object, and that even if the claim was preserved, the trial court properly gave mandatory consecutive terms for counts 6 and 7.

"Ordinarily, an appellate court will not consider a claim of error if an objection could have been, but was not, made in the lower court. [ Citation.] The reason for this rule is that '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'" (*People v. French* (2008) 43 Cal.4th 36, 46.) The rule applies with equal force to claims the trial court failed to properly make a discretionary sentencing choice. (*People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"]; *People v. Quintanilla* (2012) 170 Cal.App.4th 406, 412 [defendant forfeited claim that trial court failed to properly articulate its discretionary sentencing choices under section 667.6 by failing to object at time of sentencing].)

Here, Angeles did not raise any objection at his sentencing hearing or request that the trial court explain how it made its sentencing decision. He nevertheless asserts the forfeiture doctrine does not apply because the trial court completely failed to exercise the statutory discretion when it imposed consecutive terms on counts 6 and 7 without first determining whether Angeles committed those offenses on separate occasions. (See

*In re Sean W.* (2005) 127 Cal.App.4th 1177, 1182 ["'"[f]ailure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal"'"]; *People v. Downey* (2000) 82 Cal.App.4th 899, 912 ["'[a] ruling otherwise within the trial court's power will nonetheless be set aside where it appears from the record that in issuing the ruling the court failed to exercise the discretion vested in it by law"].) Alternatively, Angeles argues that, if his claim was forfeited, he received ineffective assistance of counsel because his trial attorney failed to raise a timely objection to the sentence in the trial court. We need not decide, however, whether Angeles forfeited his claim of error on appeal because even assuming it was preserved, the claim lacks merit.

At trial, Crystal testified that Angeles forced her to touch his penis on two occasions. On the first occasion, Angeles "grabbed [Crystal's] hand," "put it in his front pants," and then "rubbed his . . . penis" with her hand. On the second occasion, Angeles "put [Crystal's] hand [on] his penis" as she was telling him "no," "used his other hand to pull down his pants," and then made her rub his penis. In her testimony, Crystal gave descriptions of a "first time" and a "second time." Further, Crystal responded "yes" to the question, "there were two occasions when [Angeles] had you touch his penis with your hand." Detective Toone also stated that she interviewed Crystal about her allegations. When asked how many times Crystal reported that Angeles had forced her to touch his penis, Detective Toone answered: "On two separate occasions." There was no evidence the two incidents occurred on the same occasion. In closing argument, the prosecutor argued: "As to the other two

29

288 (b)s charged in this case, they relate to Crystal. And you'll recall Crystal's the one who testified the defendant took her hand on two separate occasions—and that's the two counts—and dragged it over to his penis and moved it up and down on his penis and that she tried to pull away, but she couldn't, she wasn't strong enough, and he used force to keep it there."

In their sentencing memorandum, the People argued the trial court was required to impose consecutive terms on counts 6 and 7 pursuant to section 667.6, subdivision (d), and section 269, subdivision (c).[9] In support, the People noted that Crystal had testified about "eight occasions in which [Angeles] touched her vagina and two incidents in which [he] forced her to masturbate his penis with her hand." The People asserted that, given this testimony, "there is clearly sufficient evidence for the court to find that the convictions were based on conduct committed by the defendant against the same victim on *separate occasions*."

In Angeles's sentencing memorandum, he "respectfully request[ed] that the Court exercise its discretion in sentencing him to 15 years to life consecutively on Counts 1, 6 and 7, and 15 years to life concurrent to that sentence on the remaining counts, totaling 45 years to life in prison." Angeles argued: "Penal code section 667.61(i) further dictates that, for violations of Penal Code section 288(b)(1) (lewd or lascivious act using force or fear, as alleged in counts 1, 6, and 7), the court shall impose a consecutive sentence for each offense that results in a conviction

---

**9** Section 269, subdivision (c), states: "[T]he court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."

30

under this section if the crimes involve separate victims or involve the same victim on separate occasions.  The Penal Code has no such provision of mandatory consecutive sentences for multiple violations of Penal Code section 288(a)(1), as alleged in Counts 2-5 and 9-11.  Put simply, the Penal Code requires that multiple violations of PC 288(b) be run consecutively, but allows for concurrent sentences for multiple violations of PC 288(a).  In the present case, the defendant was convicted of forcible lewd acts pursuant to Penal Code Section 288(b) in Counts 1, 6, and 7.  The remaining counts had no force allegations, and are not subject to mandatory consecutive terms."

At the sentencing hearing, the trial court stated it had "read and considered the probation report" and the "stat[utory] 99 report."  After the trial court stated that it had also "read [the] defense sentencing memorandum . . . [and] the prosecutor's sentencing memorandum," the People submitted on their sentencing memorandum.  In submitting on Angeles's sentencing memorandum, his counsel argued, "I would also submit on my sentencing memorandum requesting the minimum which would be 45 years to life in this case which I believe is substantial."[10]  After imposing a term of 15 years to life on count 1, the trial court then imposed separate consecutive terms of 15 years to life on counts 6 and 7:  "On count 6, which is also mandatory consecutive sentencing, full term consecutive, you're sentenced to the state prison for 15 year to life consecutive to Count 1.  Count 7, which is also a mandatory full term consecutive, you're

_____

[10]     The computation of counsel's recommended "minimum" sentence was based on mandatory consecutive 15-year terms on counts 6 and 7, along with same consecutive sentence for count 1.

sentenced to the state prison for 15 years to life. And that's consecutive to counts 1 and 6." While the trial court did not expressly state that Angeles committed the offenses in counts 6 and 7 on separate occasions, the trial court implicitly made that determination when it separately pronounced that count 6 and count 7 were subject to "mandatory full term consecutive" sentences.

The trial court's pronouncement was consistent with the language of section 667.6, subdivision (d), which mandates a "full, separate, and consecutive term" if the crimes at issue "involve separate victims or the same victim on separate occasions." (§ 667.6, subd. (d); see also § 667.61, subd. (i) ["the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions"].) The consecutive sentences for counts 6 and 7 were also consistent with all the evidence at trial. The evidence showed that Angeles committed a forcible lewd act against Crystal on two separate occasions. In their closing argument, the People made an election tying the "two separate occasions" on which Angeles forced Crystal to rub his penis to counts 6 and 7.[11] Indeed, both the People and Angeles agreed in their sentencing memoranda that counts 6 and 7 were subject to mandatory consecutive terms under the statutory sentencing scheme. Also, immediately before the trial court imposed the consecutive sentences on counts 1, 6, and 7, Angeles's counsel reiterated that the trial court should impose "the minimum which

[11] The prosecution makes an election by "tying each specific count to specific criminal acts elicited from the victims' testimony," typically in opening statement and/or closing argument. (*People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382; accord, *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292; *People v. Mayer* (2003) 108 Cal.App.4th 403, 418-419; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455.)

would be 45 years to life. . . ." Angeles's requested minimum sentence included consecutive terms on counts 6 and 7. There was no evidence at trial that Angeles committed the offenses in counts 6 and 7 on the same occasion. This explains why the trial court stated at the sentencing hearing that it was imposing "mandatory consecutive" terms on counts 6 and 7 without further elaboration of its reasoning. Given the trial testimony establishing two occasions, the parties' sentencing memoranda, and the lack of any evidence supporting a single occurrence of both incidents, there was no issue presented whether Angeles committed the offenses in question on the same occasion.

In sum, Angeles's contention that the trial court "did not realize that if counts 6 and 7 occurred on the same occasion then they could be concurrent" is unsupported. To conclude that the trial court imposed consecutive terms without considering the proper criteria would require this court to presume, without evidence, that the trial court erred rather than followed law, which we cannot do. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913-914.) Because there was no dispute that Angeles committed the offenses in counts 6 and 7 on separate occasions, under section 667.6, subdivision (d), the trial court was required to sentence Angeles to consecutive indeterminate terms of 15 years to life on both counts. There was no discretion that the trial court failed to exercise because the trial court had no discretion to do otherwise. (§ 667.61, subds. (b), (c)(4), (e)(4).) *People v. Zaldana, supra*, 43 Cal.App.5th at p. 536.) On this record, Angeles failed to demonstrate error in the trial court's sentencing decision.

33

D.  *Correction to the Amended Abstract of Judgment*

Angeles contends, and the People concede, that the abstract of judgment should be corrected to address an ambiguity with respect to count 7.  The original abstract of judgment filed on November 13, 2018 stated at the bottom of the first page in section 6(a) that Angeles was sentenced to 15 years to life on counts 1, 4, 6 and 7.  An attachment page to the original abstract of judgment reflects that Angeles was sentenced to consecutive terms of 15 years to life on counts 7 and 11 and to concurrent terms of 15 years to life on counts 8, 9, and 10.

The trial court filed an amended abstract of judgment on August 6, 2020.  The amended abstract of judgment corrected a prior error by properly reflecting that the sentence imposed on count 10 was consecutive and the sentence imposed on count 11 was concurrent.  However, the amended abstract of judgment includes the same references to count 7 on the bottom of the first page and on the attachment page.  Angeles asserts these multiple references to the 15-years-to-life term imposed on count 7 create an ambiguity in the abstract of judgment about the aggregate sentence imposed.  Angeles requests, and the People agree, that we order the reference to count 7 on the bottom of the first page in section 6(a) stricken because the sentence imposed on count 7 is accounted for on the attachment page.  We agree this extraneous reference to count 7 should be stricken and order the amended abstract of judgment corrected accordingly.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

34

## DISPOSITION

The judgment of conviction is affirmed.  The superior court is directed to prepare a corrected abstract of judgment striking the reference to count 7 contained at the bottom of the first page in section 6(a) and to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


DILLON, J.[*]


We concur:


PERLUSS, P. J.


FEUER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.