Filed 1/4/21  P. v. Luna CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>V.<br><br>DANIEL LEE LUNA,<br><br>  Defendant and Appellant. | 2d Crim. No. B301340<br>(Super. Ct. No. 2018038939)<br>(Ventura County) |

     Daniel Lee Luna appeals after a jury convicted him on the following charges:  one count of lewd act on a child (Penal Code, § 288, subd. (c)(1)),[1] eight counts of forcible rape (§ 261, subd. (a)(2)), three counts of oral copulation of a person under 16 years of age (former § 288a, subd. (b)(2)), and penetration by a foreign object (§ 289, subd. (i)).  As to the forcible rape counts, the jury found true the allegation that the victim was a minor 14 years of

---

     [1] All statutory references are to the Penal Code unless otherwise stated.

age or older (§ 264, subd. (c)(2)).  The court sentenced Luna to an aggregate term of 75 years and four months.

Luna contends the court erred by allowing the victim and her mother to testify about certain out-of-court statements under the "fresh complaint" exception to the hearsay rule.  He also challenges seven of his eight forcible rape convictions as lacking substantial evidence of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

We affirm.

STATEMENT OF FACTS

Luna befriended I.M. while attending a "preop" class prior to weight loss surgery.  I.M. introduced him to V.B., her 14 year old daughter, while I.M. and Luna recovered together in the hospital in February of 2018.  Luna commented how V.B. did not look her age and how beautiful she was.  He was 40 years old at the time, and, like I.M., had a son in elementary school and a teenage daughter.

Luna and I.M. exchanged phone numbers before leaving the hospital.  I.M. described him as an upbeat friend who encouraged her to "'[g]et motivated'" during the difficult recovery process.  He started offering to take V.B. and her younger brother to school so I.M. could rest, and once she recovered, so she could get to work on time.  The two children began referring to him as their "uncle."  I.M. met Luna's fiancée, with whom he owned an auto body repair shop in Ventura, as well as Luna's own daughter and son.  He welcomed V.B. and her brother to visit the autobody shop so they could use the Internet to finish homework.

Luna revealed a different side of himself one evening in March of 2018.  He invited V.B. to accompany him when he picked up a pizza at a restaurant near his shop.  In route, he

parked his van in an alley and began questioning V.B. about her sexual history. He explained how he wanted to teach the 14-year-old about different "positions" and offered to pay her to remove her shirt and bra. V.B. eventually relented when Luna continued to plead with her. He gave her $20 afterward.

About a month later he picked V.B. up from school and took her to his apartment to "hang out" until his daughter got out of school. Luna gave her a wax pen containing a marijuana cartridge to smoke. When they entered his apartment he used a drill and a long screw to secure the door. He told V.B. this was in case his girlfriend or daughter came home. He told V.B. to take a shower in the bathroom and to use a feminine hygiene product to clean herself. V.B. agreed because she could not escape the apartment and feared Luna would hurt her.

Luna went into the bathroom and peeked at V.B. while she showered. When she finished, he told the toweled girl to sit on his son's bed. He tried to kiss her, but when she did not reciprocate, he removed her towel and performed oral sex on her. Luna also put his fingers in V.B.'s vagina. Luna pressured V.B. to perform oral sex on him but she refused. He tried to put his penis in her vagina but she told him to stop because it hurt. When she tried to push him away, he forced himself into her, put a pillow over her face, and closed the window so "nobody could hear [her]" while he finished.

Luna had sex with V.B. an estimated 30 times over the next six months. He provided her with money and alcohol and encouraged her to smoke marijuana because she did not "act right" when she was not high. On at least three occasions he had sex with her in the back seat of his truck before taking her to school. V.B. described feeling like a "sex slave working for

3

money" and that she was "stuck" for as long as Luna wanted to continue abusing her. She began cutting her thighs with a razor blade as an attempt to show Luna her pain. V.B. believed she would be "in serious trouble" if she rebelled and testified Luna kept a gun and a machete in his truck. He was also much bigger physically.

V.B.'s friend C.L. learned about the abuse while the two girls attended summer school. V.B. said she did not want Luna to pick her up because he would often have sex with her. She planned to confront him that afternoon and asked C.L. to call the police if she did not hear from V.B. that evening. A few weeks later, V.B. told C.L. the sex had briefly stopped after the confrontation but had since resumed. She feared Luna might have impregnated her in the meantime.

Luna last abused V.B. on the afternoon of Halloween of 2018. He picked her up from school and drove straight to his apartment. He drilled the door shut. V.B. told Luna she did not want to have sex, but he pushed her down on the couch. He then took off her pants, grabbed her by the legs when she tried to get up, and began having sex with her. Luna took V.B. home afterward so she could go trick or treating with her friends.

V.B.'s mother confronted her when she returned from trick or treating. She found a text message containing a picture of a wax pen and stating, "Look at my new baby." They began arguing about where she obtained the pen and why she felt the need to smoke. V.B. said she did not want to talk about it and told her mother she would not understand. After persistent questioning, she admitted Luna raped her that day and on previous occasions. I.M. immediately took V.B. to the hospital where she was examined and questioned by police.

DISCUSSION

1. *The Court Properly Admitted Testimony from V.B. and Her Mother Under the Fresh Complaint Doctrine*

The People moved to admit V.B.'s statements to her mother on Halloween under the "fresh complaint" exception to the hearsay rule. Defense counsel opposed the testimony as both irrelevant and unduly prejudicial, and further, as unnecessary because V.B. herself could testify about when she first reported the abuse and went to the hospital. The court overruled the objections and allowed I.M. and V.B. to testify about the conversation.

Traditionally, the purpose of the fresh complaint exception was to forestall juries from concluding victims fabricated sexual abuse claims because they did not report the crime immediately. (*People v. Burton* (1961) 55 Cal. 2d 328, 351, citing *People v. Wilmot* (1903) 139 Cal. 103, 105 ["It is natural to expect that the victim of such a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur"].) Our Supreme Court revisited the exception in *People v. Brown* (1994) 8 Cal.4th 746, by which time behavioral research had called into question historical assumptions about how and when victims of sexual abuse report the crime to others. *Brown* discarded the admissibility factors of "freshness" and spontaneity, but cautioned courts to admit only "the fact of the making of the complaint and other circumstances material to this limited purpose." (*Id.* at p. 763.) Allowing witnesses to testify about the complaint in detail would only increase the likelihood a jury would "view these details as tending to prove the truth of the underlying charge of sexual assault . . . ." (*Ibid.*) We review an

5

order for admission of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) If evidence was erroneously admitted, we review for harmless error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.

Luna contends I.M.'s and V.B.'s testimony "far exceeded the appropriate limits" of the fresh complaint exception by shoring up prosecutors' lack of evidence showing Luna and V.B. spent time together. He argues the trial court compounded the error by failing to instruct the jury to refrain from considering it for its truth. Luna cites jurors' many questions, requests for read backs, and lengthy deliberation as indicating the testimony likely swayed opinion in a close case. We do not agree.

I.M. testified as follows about the conversation with her daughter:

"Q. Did there come a point where she told you - -

"A. Yes.

"Q. - - what she was holding back?

"A. Yes.

"Q. What did she tell you?

"A. She said 'Danny, Danny raped me.'

"Q. What was your response?

"A. I was shocked. I grabbed her and I held her because she was crying hysterically. I couldn't believe it and I, at one point, asked her 'Danny? Danny?' She said 'Yes, mom, Danny.'

"Q. Did you know who that 'Danny' was?

"A. Yes.

"Q. Who was she referring to?

"A. Danny Luna.

"Q. The one you've identified in court?

"A. Yes.

6

"Q. What did you do at that point? Did you stay in your house that evening or did you do anything?

"A. No. I asked her when it happened, and she said, 'It's been happening.'

"Q. Did you go anywhere at that point?

"A. Yes. I asked her when it happened and she said, 'It's been happening, it happened – he did it today.' And I immediately just got in the car and I took her to - - I took her to the hospital."

The People then called V.B. to the stand. She described the confrontation with her mother as follows:

"Q. And what are you saying in return to your mom?

"A. I was just freaking out. And I told her, like, it was from friends at school. And she is like, Why are you smoking? And I told her, 'You wouldn't understand.' I was just like -- I started crying. And I said, 'You wouldn't understand. Like, I can't tell you. I am going through something right now. I can't tell you.' (Internal quotes added.)

"Q. And what does your mom do when you tell her that?

"A. My mom told me there's nothing you could ever say that would make me hate you or that I would ever judge you against.

"Q. And what did you tell your mom? Did you eventually tell her what's on your mind?

"A. And then I kept crying and I said, I can't tell you. She was like, 'Just tell me already. You're scaring me. What is it?' And then I told her, 'Your friend Danny has been raping me, having sex with me.' (Internal quotes added.)

"Q. You used that term 'rape'?

"A. Yes, I did.

"Q. Is that what you were feeling?

"A. Yes.

"Q. How did your mom respond?

"A. She was shocked. She was like hysterically crying. Like, she didn't know what to do. She started crying. . . . My aunt told her, You need to rush her to the hospital. You need to take her to the hospital.

"Q. What were you feeling when you finally told someone?

"A. I felt like -- I am not going to lie. I felt relieved but at the same time I felt scared.

"Q. Why?

"A. Because.

"Q. Because why?

"A. I was just scared of what, like, my mom was going to do or, like, if she was going to tell him like right away, like, you raped my daughter, you have been doing this with my daughter, and then he would try to hurt me or hurt my family or something."

These passages described Luna's crimes in the most general terms possible. V.B. told her mother Luna "raped her" that day and on previous occasions. She did not describe the frequency, length, or location of the abuse beyond these basic facts. Both witnesses' testimony on this point served the doctrine's narrow purpose of illuminating the fact of V.B.'s first complaint about her long-term sexual abuse. (See, e.g., *People v. Jimenez* (2019) 35 Cal.App.5th 373 [trial court properly admitted victim's handwritten note to mother saying defendant had been touching her "for awile [*sic*] now"]; *People v. Ramirez* (2006) 143 Cal.App.4th 1512 [trial court properly admitted victim's statement to hotel clerk that she was "not okay" because she had

been raped by defendant]; *People v. Daily* (1996) 49 Cal.App.4th 543 [trial court properly admitted minor victim's statement to his brother that defendant had touched his penis in a nearby restroom].)

Defense counsel did not object to the scope of the People's questioning, and, in fact, elicited additional details from I.M. and V.B. on cross-examination about their conversation on Halloween night. He did not request the court instruct the jury to limit consideration of the testimony. In addition, the jurors' communications reveal they reached verdicts on 11 of 13 counts on the second full day of deliberation and the remaining two on the morning of the third. We see nothing in the record indicating the challenged testimony confused the jury, created discord, or tipped deliberations in favor of either Luna or the People. We conclude the trial court properly exercised its jurisdiction to admit this evidence.

No prejudice resulted even if the court did err. Jurors heard from several witnesses to whom V.B. confided her abuse in much greater detail than she did her mother. The nurse who examined V.B. on Halloween night recounted how V.B. described her seven months of abuse in terms far more graphic than "he raped me on several occasions." The lead case detective, Joshua Butler, recounted V.B.'s reports of being coerced into sex in the back of Luna's truck at least three times in the weeks before her complaint to I.M. V.B.'s friend C.L. testified how V.B. disclosed her fear of kidnapping or physical harm if she refused to keep having sex with Luna. Lastly, V.B. herself described the circumstances of each charged count of abuse at length and estimated Luna coerced her into sex on more than 30 occasions.

9

## 2. *Substantial Evidence Supports Luna's Forcible Rape Convictions*

The jury convicted Luna on eight counts of forcible rape. Luna challenges seven of these convictions, i.e., counts 5, 6, 8, 9, 10, 11, and 13. He argues the jury lacked sufficient evidence to find he raped V.B. "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another" on all but one occasion. (§ 261, subd. (a)(1).) Luna concedes his conviction on count 2, the one in which he covered V.B.'s face with a pillow to muffle her cries. We presume the existence of every fact supporting the judgment and what the jury reasonably could deduce from the evidence and will reverse only if no substantial evidence supports the verdict under any hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)

Establishing "force" within the meaning of section 261(a)(2) requires evidence that the defendant "'used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].'" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024, quoting *People v. Young* (1987) 190 Cal.App.3d 248, 257-258.) "In considering defendant's claim of insufficiency of the evidence of force necessary to affirm his conviction of forcible rape, we must determine only whether, on the record as a whole, any rational trier of fact could find him guilty beyond a reasonable doubt." (*Id.* at p. 1028, citing *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

The record shows V.B. told Luna on all eight occasions, often repeatedly, that she did not want to have sex with him. Luna nevertheless removed her clothing or towel, positioned her, and engaged in one or more sex acts. This alone constituted

10

"force" considering the considerable difference in their age and size. (See *Griffin*, *supra*, 33 Cal.4th at p. 1025 ["under the modern rape statute, the jury no longer evaluates the element of force in terms of whether it physically prevents the victim from resisting or thwarting the attack"].) Further, V.B. testified unequivocally at trial that she never had sex voluntarily or told Luna she desired him sexually.

More specific instances of force appear in the record as well. As to counts 6 and 7, V.B. testified Luna gave her quantities of vodka and marijuana adequate to make her feel "useless" and to weaken her resistance to Luna's advances. As to count 8, Luna responded to V.B.'s reluctance by removing her pants, holding her legs in the air, then telling her to "shhh" as she cried in pain during the subsequent abuse. As to count 10, he ordered V.B. into the back of his truck before taking her to school, removed her pants, and had sex with her from behind with V.B.'s face pressed against the window. As to count 13, Luna "forced himself" on V.B. then pushed her down when she tried to get up.

We also conclude that there was substantial evidence of duress as well. "Duress" in this context "means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b).) V.B. testified Luna trapped her by drilling the door shut on each occasion he abused her in his apartment (counts 2, 5, 6, 8, 9, 12, and 13). He showed her a handgun and machete in his truck on

11

at least one occasion, leading V.B. to believe she was in "serious trouble" if she rebelled. In addition, C.L. testified V.B. feared Luna would hurt or kidnap her and told C.L. to call the police if V.B. did not contact her later that evening.

The People's evidence is a case study of sexual predation. Luna befriended V.B.'s mother and placed himself in a position of trust by visiting her at home while she recovered from surgery. He gained access to her children by offering to pick them up from school while she remained bedridden, and later, to take them to school when she began commuting to a new job. Luna bought clothing and meals for V.B. and her brother while their mother struggled financially. He ensured V.B.'s proximity by inviting her brother and her to his shop to use the Internet and finish homework. This soon transitioned into surreptitious cash gifts, a phone, drugs, a dance dress, and alcohol to placate his adolescent victim.[2] It worked. V.B. testified she did not want to jeopardize her mother's friendship with Luna by disclosing the abuse. She feared Luna would hurt her family if he were confronted.[3] Luna

---

[2] Such "grooming" behaviors commonly precede and accompany the sexual abuse of children. See Note, *Raised by a Predator: Sex Offender Parents and an Effort to Keep Them Out of the Child's Home* (2020) 58 Fam. Ct. Rev. 847, 850-851 ("Grooming is used . . . to influence the child into cooperation, which keeps the child under the abuser's control and maintains the contact between them. The behaviors adopted by perpetrators are intentionally subtle, and include acts such as: the adult pays special interest to the child, displays favoritism within the family, and often buys the child unnecessary gifts").

[3] Appellant notes V.B.'s age and sophistication meant she could appreciate her ability to terminate her "relationship" with Luna. We are not persuaded. These factors could likewise

methodically arranged the furniture of V.B.'s life to ensure he could use her for sex at his leisure with minimal risk of getting caught.  She tolerated the abuse only by numbing herself with the palliatives so readily provided by her abuser.  We conclude ample evidence supported the jury's convictions on all eight counts of forcible rape.

DISPOSITION

Judgment is affirmed.
NOT TO BE PUBLISHED.

PERREN, J.

We concur:

YEGAN, Acting P.J.

TANGEMAN, J.

---

indicate a more nuanced cognizance of the consequences of reporting her abuse.  See London, Bruck, Ceci, & Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell?* (2005) 11 Psychol. Pub. Pol'y. and L. 194, 209 ("[A]dolescents may have a greater appreciation of the consequences of disclosing intrafamilial abuse and thus withhold information").

Anthony Sabo, Judge
Superior Court County of Ventura
_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.